**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JOEL HEABEART, *et al.*,

                    Plaintiffs,

          vs.

COINBASE, INC., *et al.*,

                    Defendants.

1:25-cv-09197(JSR)(SN)

---

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS AND MOTION TO COMPEL ARBITRATION AND STAY**
**PROCEEDINGS**

PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP

Randall Scott Luskey (admitted *pro hac vice*)
535 Mission Street
San Francisco, CA 94105
Telephone: (628) 432-5100

Paul D. Brachman
2001 K Street, NW
Washington, DC 20006
Telephone: (202) 223-7300

Kristina A. Bunting
Michael J. Pisem
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000

*Attorneys for Defendants Coinbase, Inc., Coinbase*
*Global, Inc., and Brian Armstrong*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

SUPPLEMENTAL STATEMENT OF FACTS .......................................................................... 4

      A.      Coinbase Lists WLUNA for Trading.......................................................................... 4

      B.      Coinbase Suspends WLUNA Trading. ....................................................................... 6

      C.      Terraform Releases New Blockchain and Issues New LUNA Token. ..................... 7

      D.      Plaintiffs Purportedly Access and Pull Inaccurate Account Statements.................. 8

      E.      Relevant Procedural History ...................................................................................... 8

ARGUMENT .............................................................................................................................. 9

I.      The SAC Fails to Allege Securities Fraud ............................................................................. 9

      A.      The SAC Still Fails to Plead Actionable Misstatements ........................................ 9

      B.      The SAC Still Fails to Plead Scienter .................................................................... 13

              1.      The SAC Does Not Allege Motive and Opportunity to Defraud.............. 14

              2.      The SAC Does Not Allege Conscious Misbehavior or
                      Recklessness ............................................................................................. 15

      C.      Plaintiffs Still Fail to Plead Direct and Reasonable Reliance.............................. 19

      D.      Plaintiffs Still Fail to Plead That Coinbase's Alleged Misrepresentations Caused
           Their Losses ............................................................................................................ 19

      E.      Plaintiffs' Claims Remain Time-Barred ............................................................... 20

II.      Plaintiffs Still Fail to Plead a Section 20(a) Claim ........................................................... 21

III.      The SAC Does Not Plead That the User Agreement Is an Unenforceable Contract of
          Adhesion .............................................................................................................................. 21

CONCLUSION.......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aggarwal* v. *Coinbase, Inc.*,
685 F. Supp. 3d 867 (N.D. Cal 2023) ......................................................................23

*Altimeo Asset Mgmt.* v. *Qihoo 360 Tech Co.*,
663 F. Supp. 3d 334 (S.D.N.Y. 2023)......................................................................19

*Ark. Pub. Empls.' Ret. Sys.* v. *Bristol-Meyers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) .............................................................................11, 13

*AT&T Mobility LLC* v. *Concepcion*,
563 U.S. 333 (2011).................................................................................................22

*Bd. of Trs. of Ft. Lauderdale Gen. Emps.' Ret. Sys* v. *Mechel OAO*,
811 F. Supp. 2d 853 (S.D.N.Y. 2011)......................................................................17

*Bielski* v. *Coinbase, Inc.*,
87 F.4th 1003 (9th Cir. 2023) ............................................................................23, 24

*In re Bisys Sec. Litig.*,
496 F. Supp. 2d 384 (S.D.N.Y. 2007).......................................................................17

*Blue Chip Stamps* v. *Manor Drug Stores*,
421 U.S. 723 (1975).................................................................................................19

*Chavarria* v. *Ralphs Grocery Co.*,
733 F.3d 916 (9th Cir. 2013) ...................................................................................24

*City of Brockton Ret. Sys.* v. *Avon Prods., Inc.*,
2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)..........................................................16

*Cnty. of Nassau* v. *Chase*,
402 F. App'x 540 (2d Cir. 2010) ..............................................................................23

*Cordero* v. *Coinbase, Inc.*,
2025 WL 2223495 (N.D. Cal. Aug. 5, 2025) .......................................................4, 23

*Elliott Assocs., L.P.* v. *Hayes*,
141 F. Supp. 2d 344 (S.D.N.Y. 2000).......................................................................14

*In re Gentiva Sec. Litig.*,
971 F. Supp. 2d 305 (E.D.N.Y. 2013) ......................................................................14

*In re GeoPharma, Inc. Sec. Litig.*,
  399 F. Supp. 2d 432(S.D.N.Y. 2005).................................................................................17

*Hodges* v. *Comcast Cable Commc'ns, LLC*,
  21 F.4th 535 (9th Cir. 2021) .........................................................................................25

*Jackson* v. *Halyard Health, Inc.*,
  2018 WL 1621539 (S.D.N.Y. Mar. 30, 2018) ............................................................15

*Kalnit* v. *Eichler*,
  264 F.3d 131 (2d Cir. 2001).........................................................................................15

*Lane* v. *Francis Capital Mgmt. LLC*,
  224 Cal. App. 4th 676 (2014) .....................................................................................23

*In re Livent, Inc. Noteholders Sec. Litig.*,
  151 F. Supp. 2d 371 (S.D.N.Y. 2001).........................................................................21

*Lockhart* v. *BAM Trading Servs., Inc.*,
  No. 3:22-cv-3461 (N.D. Cal June 13, 2022)..............................................................4, 5

*Maloney* v. *Ollie's Bargain Outlet Holdings, Inc.*,
  518 F. Supp. 3d 772 (S.D.N.Y. 2021).....................................................................15, 16

*Novak* v. *Kasaks*,
  216 F.3d 300 (2d Cir. 2000).................................................................................14, 15, 18

*O'Donoghue* v. *Super. Ct.*,
  219 Cal. App. 4th 245 (2013) .....................................................................................23

*Pearl* v. *Coinbase Glob., Inc.*,
  2023 WL 1769190 (N.D. Cal. Feb. 3, 2023) ...............................................................23

*Puchtler* v. *Barclays PLC*,
  2025 WL 887502 (S.D.N.Y. Mar. 21, 2025) ....................................................17, 18, 20

*In re Qiwi plc Sec. Litig.*,
  2023 WL 7283619 (E.D.N.Y. Nov. 3, 2023)...............................................................18

*Rombach* v. *Chang*,
  355 F.3d 164 (2d Cir. 2004)....................................................................................10, 12

*S. Cherry St., LLC* v. *Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009)......................................................................................13, 14

*Sanchez* v. *Valencia Holding Co., LLC*,
  61 Cal. 4th 899 (2015) .................................................................................................24

iv

*Shearson/Am. Express, Inc.* v. *McMahon*,
    482 U.S. 220 (1987)......................................................................................................23

*Tarverdiyeva* v. *Coinbase Glob., Inc.*,
    2021 WL 4527960 (M.D. Fla. Sept. 8, 2021)..............................................................22

*Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008)........................................................................................15

*U.S. Life Ins. Co.* v. *Ins. Comm'r of California*,
    160 F. App'x 559 (9th Cir. 2005) ..........................................................................22, 23

*Verschleiser* v. *Frydman*,
    2023 WL 5835031 (S.D.N.Y. Sept. 7, 2023)..............................................................21

*Wayne* v. *Staples, Inc.*,
    135 Cal. App. 4th 466 (2006) .....................................................................................23

*Woody* v. *Coinbase Glob., Inc.*,
    2023 WL 6882750 (N.D. Cal. Oct. 17, 2023)..............................................................25

*Woolgar* v. *Kingstone Cos., Inc.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020)..........................................................................17

*Xerion Partners, I LLC* v. *Resurgence Asset Mgmt., LLC*,
    474 F. Supp. 2d 505 (S.D.N.Y. 2007)..........................................................................14

*Zanghi* v. *Ritella*,
    2021 WL 4392756 (S.D.N.Y. Sept. 24, 2021)...............................................................5

## Statutes & Rules

15 U.S.C. § 78u-4 ................................................................................................... *passim*

## PRELIMINARY STATEMENT

After full briefing and oral argument, the Court recognized that the First Amended Complaint ("FAC") "likely fail[ed] to state securities claims that meet the pleading standards of the PSLRA or the statute of limitations," and that Plaintiffs' "non-securities counts in the [FAC] would . . . likely be referred for arbitration." Dkt. 93 at 1–2. The Court gave Plaintiffs a final opportunity to file a Second Amended Complaint ("SAC")[1] to try to cure the defects in their securities claims and allege a basis why their remaining claims should not be referred to arbitration. Plaintiffs' SAC includes pages of irrelevant background lifted nearly verbatim from a different complaint against different defendants, an improper expert report, and 232 pages of exhibits that are in many cases incomplete and lack critical context. But Plaintiffs' additions do not change what the Court already observed: Plaintiffs' securities claims are meritless and time-barred, and the remaining claims are subject to the Parties' arbitration agreement.

The SAC lays bare Plaintiffs' real complaint: they purchased a digital asset created by third-party Terraform Labs called WLUNA—a token that tracked the price of another Terraform token called LUNA ("Original LUNA")—on Coinbase's exchange mostly in May 2022 as WLUNA's price was rapidly decreasing, presumably with the hope of a windfall from a price rebound. But the price did not rebound and the Terra ecosystem collapsed. Immediately after the collapse, Terraform issued a new token also called LUNA ("New LUNA") and distributed or "airdropped" some of these tokens to Original LUNA holders but not WLUNA holders. Original LUNA and WLUNA were renamed LUNC and WLUNC. The New LUNA token was valued significantly higher than WLUNC or LUNC. Plaintiffs are disgruntled that they did not receive

---

[1] Unless otherwise indicated, "¶" refers to paragraphs in the SAC. Other capitalized terms and abbreviations have the same meanings as in Defs.' Motion to Dismiss (Dkt. 85) and Motion to Compel Arbitration (Dkt. 84).

New LUNA.  Instead of suing Terraform, however, they assert ten causes of action against Defendants, including two securities fraud claims.  But Plaintiffs agreed to resolve their non-securities claims against Coinbase (Counts III–X) through arbitration.  And Coinbase's alleged misconduct does not come close to being intentional or consciously reckless.  Accordingly, Plaintiffs' securities claims fail on multiple independent grounds, and their remaining claims must be sent to arbitration for the reasons summarized below.

*First*, Plaintiffs fail to plead particularized facts showing that Defendants made any misleading statements.  Plaintiffs' first claim—that Defendants misleadingly guaranteed that WLUNA could be converted to the New LUNA tokens—fails because Coinbase's alleged misstatement could not have been about New LUNA; it was made *before* the issuance of the new token and is not alleged to have remained on Coinbase's website after the new token's issuance. Plaintiffs also challenge Coinbase's statement that it had "suspended trading in WLUNA," claiming that the use of "suspend" implied a temporary trading suspension.  But again, the SAC— including Defendants' statements cited therein—undermines their interpretation.  Plaintiffs' exhibits purportedly showing that Coinbase described the suspension as temporary to Plaintiffs in other communications show no such thing; they lack any indication that the communications were between Coinbase and Plaintiffs.  Regardless, Plaintiffs plead no facts showing that the statement was false *at the time it was made*.  Finally, Plaintiffs' purportedly inaccurate account statements could not have been misleading because Plaintiffs admit they knew they were inaccurate.

*Second*, Plaintiffs have not remedied their failure to plead particularized facts raising a strong inference that Defendants intended to deceive investors or were consciously reckless as to the falsity of their statements.  Plaintiffs' "scienter" allegations (¶¶ 104–105) confirm that Plaintiffs cannot meet their exacting pleading burden under the PSLRA and Rule 9(b).  Plaintiffs

fail to plead any facts showing Defendants were motivated to defraud WLUNA purchasers because Plaintiffs refer only to certain equity investments by a Coinbase affiliate and Armstrong, but do not explain how they benefited Defendants, let alone how they were connected to the alleged fraud. Nor do Plaintiffs plead conscious misbehavior or recklessness—there are no particularized facts showing that Defendants were aware of specific information contradicting their statements before they made them. The most Plaintiffs can muster is to conclusorily assert that Armstrong "personally approved the WLUNA listing," but they fail to allege what contradictory information Armstrong knew, or when or how he received it. And the core operations inference remains unavailing for the same reasons outlined in Defendants' prior briefing.

*Third*, the SAC still fails to plead, and in fact contradicts, any claim Plaintiffs reasonably and directly relied on Defendants' alleged misstatements. Plaintiffs cannot have relied on any alleged misrepresentation regarding the WLUNA trading suspension or inaccurate account statements, because the SAC does not allege any Plaintiff purchased or sold WLUNA after Coinbase announced the trading suspension on May 27, 2022 or after Plaintiffs generated their account statements. Moreover, any reliance on the purportedly inaccurate account statements was unreasonable because the inaccuracies were obvious on the face of the statements.

*Fourth*, Plaintiffs do not plead that Defendants' misrepresentations caused their losses. Their claim that they are entitled to the value of the New LUNA token is completely disconnected from the alleged misrepresentations because their theory relies on multiple speculative inferences, including inferring they would have received New LUNA tokens from third-party Terraform.

*Fifth*, Plaintiffs' claims remain time-barred because the facts underlying their claims were reasonably discoverable prior to May 2023.

*Sixth*, Plaintiffs' Section 20(a) claim fails because they do not plead any primary violation

and identify no facts showing Armstrong's or Coinbase Global's culpable participation.

*Finally*, Plaintiffs' remaining claims (Counts III–X) must be resolved through arbitration, as the Parties agreed in the Coinbase User Agreement.  Plaintiffs continue to assert that they and "Coinbase, Inc. entered into a **valid, enforceable contract**, the terms of which are set forth in Coinbase's User Agreement."  ¶ 125 (emphasis added).  The Court invited Plaintiffs to plead any "basis, if they have one, for asserting that the Coinbase User Agreement is a contract of adhesion so unconscionable as to be unenforceable."  Dkt. 93 at 2.  Plaintiffs have not done so.  Contradicting other allegations, ¶ 125, Plaintiffs now claim that the Coinbase User Agreement is a contract of adhesion that is against public policy, ¶ 25, but assert no facts to support that conclusion.  State and federal policy *favors* arbitration, and the Coinbase User Agreement is enforceable because "Coinbase users were not beholden to the website nor forced to accept its terms."  *Cordero* v. *Coinbase, Inc.*, 2025 WL 2223495, at *7 (N.D. Cal. Aug. 5, 2025).

In sum, the SAC falls well short of the PSLRA's demanding pleading standards and confirms that Plaintiffs cannot plead a securities fraud claim against Coinbase, and therefore Counts I and II should therefore be dismissed with prejudice.  Plaintiffs' remaining claims should be directed to arbitration and the case stayed while those claims are pending.

**SUPPLEMENTAL STATEMENT OF FACTS**

Many of the SAC's background facts (¶¶ 26–92) are copied almost verbatim from a 2022 complaint filed by different parties against a different defendant.  *Lockhart* v. *BAM Trading Servs., Inc.*, No. 3:22-cv-3461 (N.D. Cal June 13, 2022).  Below Defendants set out only the relevant facts, which supplement those in their prior briefing.  Dkt. 85 at 5–9, Dkt. 91.

**A.    Coinbase Lists WLUNA for Trading.**

Terraform developed a cryptocurrency ecosystem, including a native cryptocurrency called LUNA ("Original LUNA").  ¶ 2.  Because Original LUNA was not compatible with other

blockchains, Terraform Labs allegedly introduced "Wrapped LUNA," or WLUNA, which "bridged" Original LUNA to the Ethereum blockchain, creating the ability to trade the digital asset on other systems, including on Coinbase's exchange.[2] ¶¶ 2–3, 98.

Coinbase listed WLUNA on its exchange in August 2021. ¶ 95. Coinbase then informed purchasers (1) that WLUNA was a separate token from Original LUNA that was designed to track Original LUNA's value and (2) that WLUNA would have to be exchanged for Original LUNA through a third-party partner. Specifically, it stated on the webpage titled "Wrapped LUNA Token price" that "Wrapped Luna (WLUNA) is an Ethereum token that's intended to represent Terra (LUNA) on the Ethereum blockchain. ***It is not LUNA***, but rather a separate ERC-20 token that's designed to track LUNA's value . . . ***Through a WLUNA partner***, 1 LUNA can be exchanged for 1 WLUNA, and vice-versa." *Id.*; Luskey Decl., Ex. 1 (archived copy of WLUNA Coinbase page as of May 23, 2022) (emphasis added).

Coinbase's User Agreement also warned users about unsupported digital assets and protocols. It stated that, unless otherwise specifically announced, Coinbase did not support other protocols and/or functionality that supplemented or interacted with supported digital assets like WLUNA, stating that the exclusion included "forked protocols, tokens, or coins." Totkov Decl., Ex. 15 ¶ 2.4. When accepting the User Agreement, Plaintiffs "acknowledge[d] and agree[d]" that they "accept[ed] the risks of operating changes to Digital Asset protocols" and agreed that Coinbase had "no responsibility to assist" them "with unsupported currencies or protocols" or to

---

[2]    Plaintiffs claim that Coinbase "represented the value of WLUNA was pegged to $1 stabilized through a system of supply control and profit-taking arbitrage incentives related to LUNA." Plaintiffs fail to identify any such statement by Defendants, which makes sense because it describes the pricing mechanism for a different token: UST. The genesis of this error appears to be that Plaintiffs copied a substantially similar statement in the *Lockhart* Complaint (at ¶ 40), which referred to UST.

"support new digital asset forks or operating changes." *Id.* at ¶ 2.5.

           **B.**        **Coinbase Suspends WLUNA Trading.**

In May 2022, the Terra ecosystem collapsed, triggered by significant withdrawals and conversions of Original LUNA's sister cryptocurrency, UST. ¶¶ 66–75. As a result, Original LUNA's price decreased significantly over the course of the month and, because WLUNA's price tracked Original LUNA's price, WLUNA's price also declined. *Id.*; *see also* Ex. A at 6 (admitting "price movements of WLUNA were virtually identical to [Original] LUNA.")

As the SAC concedes, on May 13, 2022, Coinbase announced that due to volatility involving the Terra ecosystem, it would suspend trading in WLUNA on the Coinbase platform, effective May 27, 2022. ¶¶ 3, 105; Ex. D at 136. On May 20, 2022, Coinbase Cloud announced on Twitter that it was "wind[ing] down support for the Terraform ecosystem" and "discontinuing support for the existing Terra chain and are not planning to support a potential new Terra chain at this time." Supp. Luskey Decl., Ex. 4;[3] *see also* ¶ 98. Coinbase suspended WLUNA trading on the Coinbase platform on May 27, 2022. ¶ 130. It replaced the above-referenced statement on the Coinbase "Wrapped LUNA Token price" webpage concerning the relationship between WLUNA and Original LUNA with the following: "In light of volatility involving Terra ecosystem assets, Coinbase has suspended trading in WLUNA on May 27, 2022. Your ability to store, send, and receive WLUNA is not impacted." Luskey Decl., Ex. 2.

Plaintiffs allege they purchased WLUNA prior to May 27, 2022. *See* ¶¶ 12–15, 17; Ex. C at 89, 91, 93, 100, 108.[4] As Plaintiffs admit, after May 27, 2022, they were still able to "unwrap"

---

[3]    The Court may take judicial notice of the exhibits to the Supplemental Declaration of Randall S. Luskey ("Supp. Luskey Decl.") for the same reasons stated in Defs.' MTD Br. at 3 n.2.

[4]    Only certain WLUNA trades on Coinbase are referenced in the SAC exhibits, and they were made in May 2022 after the Terra ecosystem started to collapse. *See* Exs. E-2 at 9-10, 11-12; E-3 at 17-24; E-4 at 25-26; E-5 at 30-45; E-6 at 47-58; E-7 at 60-61; E-8 at 65-66.

their WLUNA via third parties—as Coinbase had informed users on the "Wrapped LUNA Token price" page—despite Coinbase's suspension of WLUNA trading.  ¶ 98; *see also* ¶ 100 ("WLUNA holders would need to move the WLUNA out of Coinbase, unwrap it and then convert to [Original] LUNA with TFL tools.").

### C.   Terraform Releases New Blockchain and Issues New LUNA Token.

On May 28, 2022—the day after Coinbase suspended WLUNA trading—Terraform launched a new iteration of the Terra blockchain, and in turn, created the New LUNA token.  The Original LUNA  token—the token that corresponded with the WLUNA traded by Coinbase—was renamed LUNA Classic and traded under the ticker LUNC.  Supp. Luskey Decl., Ex. 5 (Terraform "Exchange Migration Guide" stating "Luna will become Luna Classic (LUNC)"); SAC Ex. A at 4 (stating "Exchange Migration Guide published by Terraform" was basis for WLUNA renaming).

Terraform "airdropped" or distributed New LUNA to holders of Original LUNA—but not holders of WLUNA—on May 28, 2022.  Previously, Terraform disclosed that the amount of New LUNA that a holder was eligible to receive would be determined by the type and quantity of tokens held and the time period when they were held, based on "snapshots" taken on May 7 and May 27, 2022.  Supp. Luskey Decl., Exs. 5, 6.  Terraform warned that users that held "[Original] LUNA . . . bridged off of Terra" (like WLUNA) "who would like to be included" in the airdrop "need to bridge back to Terra before the snapshot is taken."  *Id.*  After Terraform released New LUNA, Coinbase renamed WLUNA to WLUNA Classic or WLUNC to clarify that WLUNA tokens did not correspond with or track New LUNA.  *See* Luskey Decl., Ex. 1.  Coinbase never suggested that the original WLUNA or WLUNC had any relationship with New LUNA or that it would participate in any airdrop.  In fact, Coinbase Support stated: "Coinbase will not initially be supporting the [New LUNA] airdrop.  If we do support it in the future then we'll announce the details via our help center page & our official social media handles."  Supp. Luskey Decl., Ex. 7.

### D.    Plaintiffs Purportedly Access and Pull Inaccurate Account Statements.

According to Plaintiffs, at some point between 2021 and 2024, Coinbase reported inaccurate information about their WLUNA holdings in certain account statements accessible on Coinbase's website.  ¶ 4.   Plaintiffs allege that the inaccuracies became "widely apparent to Plaintiffs . . . on or about August 30, 2024, when WLUNA purchasers publicly posted step-by-step instructions . . . showing how to generate Coinbase tax reports that displayed" the purportedly inaccurate information. *Id.*; *see* Ex. F at 75.  But the SAC does not allege which Plaintiffs accessed the relevant account statements, when each Plaintiff did so, or what the exact inaccuracies were. Indeed, the SAC only attaches purportedly inaccurate account statements for certain Plaintiffs[5]—some of which are incomplete[6]—and appear to relate to different time periods and even non-Plaintiffs.  *See* Ex. C-1 at 116–17 (account statement for "Daniel Perez," who is not a Plaintiff).

### E.    Relevant Procedural History

On January 9, 2026, Defendants filed a motion to dismiss the securities law claims and all claims against Coinbase Global, and a motion to compel arbitration of the non-securities claims. Dkts. 80–85.  Following oral argument, the Court ruled on March 16, 2026 that Plaintiffs' "complaint likely fails to state securities claims that meet the pleading requirements of the PSLRA or the statute of limitations," and granted Plaintiffs "leave to try to cure these deficiencies by filing a Second Amended Complaint."  Dkt. 93 at 1.  The Court further ruled that Plaintiffs' non-securities counts "would, on the current record, likely be referred for arbitration," but granted Plaintiffs leave to plead "a basis, if they have one, for asserting that the Coinbase User Agreement

---

[5]    Plaintiffs attach alleged inaccurate account statements in the names of the following Plaintiffs: Israel Alatriz (Ex. E), Maria Cecilia Lucanera (Ex. E-1), Justin Moran (Ex. E-4), and Aaron Duncan (Ex. E-8), but do not do so for any other Plaintiff.

[6]    *See* Ex. C-1 at 127-29.

is a contract of adhesion so unconscionable as to be unenforceable." *Id.* at 2.  Plaintiffs filed the SAC on March 27, 2026.  Defendants now renew their motion to dismiss Plaintiffs' securities claims (Counts I and II) and their motion to compel arbitration of all other claims, incorporating by reference all prior filings and arguments made in support of each motion.

## ARGUMENT

### I.    The SAC Fails to Allege Securities Fraud

#### A.    The SAC Still Fails to Plead Actionable Misstatements

Plaintiffs still fail to plead particularized facts showing that Coinbase made any false or misleading statements, as the PSLRA requires.[7]  A full recitation of the applicable legal principles is set forth in Defendants' prior motion to dismiss briefing.  Dkts. 85 at 12–13, 91 at 3–5.[8]

***Peg***.  The SAC alleges that in August 2021, Coinbase stated that "Wrapped Luna (WLUNA) is an Ethereum token that's intended to represent Terra (LUNA) on the Ethereum blockchain.  Through a WLUNA partner, 1 LUNA can be exchanged for 1 WLUNA, and vice-versa."  ¶ 95.  Plaintiffs concede that this statement was not false if it referenced the relationship between WLUNA and Original LUNA.  Indeed, Plaintiffs admit that "price movements of WLUNA were virtually identical to [Original] LUNA so it appears that WLUNA was mirroring [Original] LUNA in the most critical aspect of all, market price."  Ex. A at 6.

Rather, Plaintiffs claim that the statement guaranteed that WLUNA purchased on Coinbase could be converted to the New LUNA issued by Terraform following the ecosystem collapse.  *See,*

---

[7]    To the extent that Plaintiffs claim they were misled by the statement "[w]rapped assets are backed 1:1 by the underlying asset" and "[y]our crypto is your crypto," *see* Ex. C at 89, 93, 106, that is not alleged in the SAC.  Plaintiffs do not explain when they saw this statement and there is no indication in the SAC that it was on Coinbase's website at any relevant time.

[8]    Defendants incorporate by reference all arguments and exhibits previously submitted in support of their Motion to Dismiss.  Dkts. 85 ("MTD Br."), 91 ("MTD Reply Br.").

*e.g.*, ¶ 105 ("Because the WLUNA smart contract contained no enforceable 1:1 peg . . . the only way Plaintiffs could have realized value was through conversion to the new LUNA 2.0 airdrop."); *see also* ¶¶ 3, 25, 99.  But this interpretation is belied by the plain language of the statement, its timing, and context.  First, the SAC purports to quote Coinbase directly, but omits a critical part of Coinbase's actual statement, which noted that WLUNA "is not LUNA, but rather a *separate* ERC-20 token that's *designed to track LUNA's value*."  Luskey Decl., Ex. 1 (emphases added).  Coinbase further stated: "*Through a WLUNA partner*, 1 LUNA can be exchanged for 1 WLUNA, and vice-versa."  *Id.* (emphasis added).  Thus, the plain language of the statement made clear that (1) WLUNA purchasers held an entirely different token than any LUNA token, and (2) exchanging WLUNA for any LUNA token required additional steps through a third party.  There was no guarantee of an "enforceable" or "immutable" 1:1 peg between WLUNA and any LUNA token, and no representation that WLUNA tokens could be exchanged on Coinbase's platform.

In addition, the timing and context shows that no reasonable WLUNA purchaser could have interpreted Coinbase's statement to be referring to New LUNA, which Plaintiffs concede was "an entirely new asset/token."  Ex. A at 4; *see Rombach* v. *Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004) ("The test for whether a statement is materially misleading . . . is whether the defendants' representations, taken together and in context, would have misled a reasonable investor.") (cleaned up).  The SAC admits that Coinbase's statement appeared on its website in August 2021—well before the launch of New LUNA—and the SAC fails to allege that this statement was still on Coinbase's website when New LUNA was launched.  *See* ¶ 95.  Moreover, the SAC includes other Coinbase statements undermining Plaintiffs' interpretation, including that Coinbase "announced that it would no longer support the Terra Ecosystem and would not be participating in any future token offerings" by Terraform on May 20, 2022.  ¶ 98.

- 10 -

To the extent Plaintiffs' claim is that WLUNA was not "wrapped" as Coinbase represented because the WLUNA smart contract did not enforce the ability to exchange WLUNA and any form of LUNA, that claim also fails.[9]   The SAC simply "incorporate[s] by reference" a purported "expert report" from Extra von NotHaus (the "NotHaus Report") and asserts that the "Report confirms . . . the WLUNA contract . . . . contains no wrapping logic."  ¶ 93; Ex. A.  But for the reasons set out in Defendants' separately filed motion to strike the NotHaus Report and all SAC references to it, the Court should disregard this report.  Regardless, the Report cannot "substitute for facts under the PSLRA."  *Ark. Pub. Empls.' Ret. Sys.* v. *Bristol-Meyers Squibb Co.*, 28 F.4th 343, 354 (2d Cir. 2022) (citation omitted).  Setting aside the NotHaus Report, the SAC pleads no particularized facts supporting Plaintiffs' interpretation of the technical term "wrapped" or showing that Coinbase's statement (which was in fact defining WLUNA) read in context was misleading.  The plain language of Coinbase's statement undermines Plaintiffs' interpretation; Coinbase does not represent that there is any enforcement mechanism built into WLUNA, but instead states that exchanges must occur through "[a] WLUNA partner."  Luskey Decl., Ex. 1.

*Suspension*.   Recognizing that Coinbase's statement about the WLUNA trading suspension did not use the word "temporary," Plaintiffs pivot to claiming that (1) the word "suspension impl[ied] it was temporary," and (2) "Coinbase representatives repeated the same temporary assurance in text-message responses to customers."  ¶ 104.  But this claim fails for two independent reasons: Plaintiffs' interpretation is implausible and, even accepting that

---

[9]   Coinbase's alleged misrepresentation of "wrapped" not only fails for lack of falsity but also for failure to plead loss causation; Plaintiffs concede that before and after the Terra ecosystem collapse, they had the ability to withdraw WLUNA from Coinbase and unwrap it on another platform.  ¶ 98 ("There were third party nodes that existed" to bridge and unwrap WLUNA); *Id.* ("Bridging and wrapping WLUNA" possible around 2022); *see also* ¶ 100 (alleging that WLUNA holders could "unwrap it and then convert to [Original] LUNA" to receive the New LUNA airdrop).  It also fails on scienter and statute of limitations grounds.  *See infra*.

interpretation, there are no allegations that the statement was false *at the time it was made*.

The SAC does not explain how Defendants' "representations, taken together and in context, would have misled a reasonable investor." *Rombach*, 355 F.3d at 172 n.7 (citation omitted). Plaintiffs' own allegations, including Defendants' contemporaneous statements, provide relevant context that render any understanding that "suspension" implied "temporary" to be unreasonable. Specifically, Plaintiffs allege that, following the May 13, 2022 suspension announcement, Coinbase announced on May 20 that "it would no longer support the Terra Ecosystem" or any future token offerings by Terra. ¶ 98. They also allege that Terraform later "executed a fork and airdrop" of the New LUNA token, ¶ 99, which they acknowledge "is an entirely new asset/token," Ex. A at 4. And, importantly, they allege that WLUNA's price "had already crashed to $0.0001" at this time—indeed, they admit that "*the only way* Plaintiffs could have realized value was through conversion to the [New LUNA] airdrop." ¶ 105 (emphasis added). It is therefore implausible that a reasonable WLUNA purchaser would have understood Coinbase's suspension announcement as implying that Coinbase would permit any future WLUNA trading.

The SAC's allegations that Coinbase representatives used the word "temporary" in communications about the suspension are similarly unavailing. There are no particularized facts alleging when any such statements were made *to Plaintiffs* or how they were misleading in context. The communications appended to the SAC lack any indication that they actually came from Coinbase representatives. *See* Ex. G at 82–83. And one of the alleged chats is dated July 29, 2024, but Plaintiffs do not attempt to explain how messages more than two years after Coinbase's suspension announcement could contextualize Coinbase's statement, especially given the broader context of the Terra ecosystem collapse and subsequent events. Similarly, Plaintiffs' exhibits with screenshots showing that "[c]onverting to WLUNA is temporarily disabled," *id.* at 84–86, are

entirely unaddressed in the SAC, giving Defendants and the Court no indication of when these images were captured and whether they came from Plaintiffs; there is no allegation that Plaintiffs received or saw that alleged statement at all.

Finally, even accepting Plaintiffs' interpretation that "suspension" implied "temporary," there are no allegations that the statement was false at the time it was made. The SAC makes the conclusory assertion that Coinbase had "internal knowledge that it would not restore trading," ¶ 109, but is silent as to when. And the conclusory, purported expert opinion that "Plaintiffs are likely correct that Coinbase never intended to reinstate trading," Ex. A at 3, "cannot substitute for facts under the PSLRA." *Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 354.

***Tax and Account Statements***. The SAC adds nothing to remedy Plaintiffs' failure to allege how they were misled by the Coinbase account statements. Plaintiffs concede that the inaccurate account statements showed "***impossibly*** large 2021 transaction values that contradicted blockchain records." ¶¶ 101, 103 (showing values in the hundreds of millions). Plaintiffs therefore admit that the account statement inaccuracies, to the extent any existed, could not have misled any reasonable WLUNA purchaser. In fact, the SAC alleges that Plaintiffs learned how to "generate Coinbase tax reports that displayed values wildly inconsistent with on-chain reality" ***themselves***. ¶ 4. But Plaintiffs never explain how reports they created themselves that they allegedly knew to be inaccurate "misle[d] investors regarding their holdings and transaction histories," ¶ 109.

In sum, the SAC fails to explain how any of Defendants' alleged statements were actually false or misleading; Plaintiffs' allegations remain insufficient to plead falsity with particularity and their claims should be dismissed with prejudice.

## B.    The SAC Still Fails to Plead Scienter

None of the facts alleged in the SAC remedy Plaintiffs' failure to plead a strong inference of scienter or a "state of mind *approximating actual intent*." *S. Cherry St., LLC* v. *Hennessee Grp.*

- 13 -

*LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (citation omitted) (emphases in original). A full recitation of the applicable law is set forth in Defendants' prior briefing, Dkt. 85 at 16–17; Dkt. 91 at 5–9. The SAC fails to raise any inference of scienter, let alone a strong one that outweighs any non-culpable inference because it fails to plead particularized facts showing motive or conscious recklessness.

### 1.     The SAC Does Not Allege Motive and Opportunity to Defraud

Plaintiffs still fail to allege that Defendants received a concrete and personal benefit from the alleged fraud. At most, the SAC vaguely suggests that Coinbase Ventures could have obtained some benefit from its investment in Terraform and that Armstrong had "indirect equity exposure" to Terraform through that investment. ¶ 104. But Plaintiffs fail to explain how, if at all, Defendants benefited from this investment, much less in a way that shows "a unique connection" to the alleged fraud. *In re Gentiva Sec. Litig.*, 971 F. Supp. 2d 305, 334 (E.D.N.Y. 2013); *see also Elliott Assocs., L.P.* v. *Hayes*, 141 F. Supp. 2d 344, 359 (S.D.N.Y. 2000) ("Absent more specific factual allegations" such as "what percentage ownership defendants had" and how they benefited from alleged fraud, motive allegations were "merely speculative assertions"). In any event, Defendants' alleged financial stake in Terraform and incentive to profit from promotion of WLUNA are generic corporate profit motives "possessed by virtually all corporate insiders" and insufficient to give rise to any scienter inference. *Novak* v. *Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000); *see also Xerion Partners, I LLC* v. *Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 517 (S.D.N.Y. 2007) ("general allegations that the defendants acted in their economic self-interest are not enough" to show motive) (quoting *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000)).

### 2.    The SAC Does Not Allege Conscious Misbehavior or Recklessness[10]

Absent any motive allegations, "the strength of the circumstantial allegations" of conscious misbehavior or recklessness "must be correspondingly greater." *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).  Plaintiffs must allege particularized facts showing that, at minimum, Coinbase senior management had access to information contradicting the alleged misstatements, and they must "specifically identify the reports or statements containing" such contradictory information. *Maloney* v. *Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 780 (S.D.N.Y. 2021) (quoting *Novak*, 216 F.3d at 309 (2d Cir. 2000)).  Indeed, there are no facts showing that Armstrong or other senior management received specific information internally or from Terraform apprising them that any Coinbase statements regarding the purported peg, the trading suspension, account statements, or any other Coinbase statement was false, which is dispositive. *See, e.g.*, *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (plaintiffs "must specifically identify the reports or statements" apprising defendants of contrary facts) (citation omitted); *Jackson* v. *Halyard Health, Inc.*, 2018 WL 1621539, at *8 (S.D.N.Y. Mar. 30, 2018) (plaintiffs must allege executives "personally received" contradictory information). Plaintiffs' vague and conclusory allegations raise no inference of conscious recklessness.

*Armstrong*.  In a futile effort to suggest that Armstrong was involved, Plaintiffs merely allege that he "personally approved the WLUNA listing."  ¶ 104.  This conclusory statement demonstrates that they have no facts showing he was involved at all, much less that he was apprised of specific information contradicting Coinbase's alleged misrepresentations before it made them.[11]

---

[10]    To the extent that Plaintiffs allege that Defendants acted negligently, ¶ 110 , that is insufficient to plead scienter, requiring dismissal. *See Zanghi* v. *Ritella*, 2021 WL 4392756, at *11 (S.D.N.Y. Sept. 24, 2021) (mere negligence insufficient).

[11]    Plaintiffs further allege that "Coinbase possessed actual, real-time awareness of the extreme uncertainty and procedural turmoil surrounding the LUNA 2.0 fork, airdrop, and migration"

*See Maloney*, 518 F. Supp. 3d at 780 (plaintiffs "must specifically allege defendants' knowledge of facts or access to information contradicting their public statements" to plead scienter) (cleaned up).  Nor does one email a Plaintiff sent to Armstrong in February 2025 reveal anything about information that was available to him or other senior management at the time the alleged misrepresentations were made (well before February 2025).  *See* Ex. C-1 at 113–14.

*"Technical Roadmap and Smart-Contract Specifications."*  Plaintiffs assert that Coinbase obtained "direct access to Terraform's technical roadmap and smart-contract specifications" because a related entity participated in Terraform's January 2021 funding round and Coinbase promoted WLUNA.  ¶ 104.  But Plaintiffs fail to allege what information Coinbase obtained, who obtained it, if it was communicated to Coinbase senior management, or how that information contradicted the alleged misstatements.  Indeed, Plaintiffs concede that this is vague speculation because they admit that the "specifics" of any "inside information" to which Coinbase purportedly had access is "currently unclear."  Ex. A at 6; *see City of Brockton Ret. Sys.* v. *Avon Prods., Inc.*, 2014 WL 4832321, at *28 (S.D.N.Y. Sept. 29, 2014) ("'[S]peculation and conclusory allegations will not suffice' to plead scienter.") (quoting *Ganino*, 228 F.3d at 169 (2d Cir. 2000)).

*Coinbase Engineers*.  Plaintiffs claim it was "well within the capacity of Coinbase's engineers to review" the WLUNA contract, ¶ 104, but they do not plead any specific facts as to what Coinbase engineers knew as to WLUNA's "wrapping functions" or smart contract, or when they knew it.  Nor do they allege that Coinbase senior management was aware of the specific technical details of WLUNA—one of many crypto assets Coinbase listed.  And there is no

---

because "Rohit," allegedly "a Coinbase Cloud representative," participated in a Terraform group chat on May 12, 2022.  ¶¶ 97, 104; *see also* Ex. H at 88.  This, too, is insufficient to plead scienter—there are no facts about the position of this "representative" within Coinbase, what specific information was shared in the group chat, or whether and how any such information was conveyed to Coinbase senior management.

allegation that any Coinbase engineers shared any information, let alone specific, contradictory information, with senior management. *See Bd. of Trs. of Ft. Lauderdale Gen. Emps.' Ret. Sys* v. *Mechel OAO*, 811 F. Supp. 2d 853, 870–71 (S.D.N.Y. 2011) (no recklessness where officers and directors not alleged to have been made aware of contradictory information).  In any event, Plaintiffs admit that the WLUNA contract was "publicly verifiable," ¶ 104, and they cannot plead scienter "based solely on the contradiction between *public* information and the company's public statements." *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 452 (S.D.N.Y. 2005).

*Other Allegations*.  The remainder of Plaintiffs' scienter allegations are plainly insufficient to plead conscious misbehavior or recklessness.[12]  The SAC alleges that "internal Coinbase records (to be produced in discovery) show Defendants continued to facilitate WLUNA trades internally while publicly suspending retail access," but this is wholly conclusory.  ¶ 104.  Plaintiffs admit that they have no specific facts about these "internal Coinbase records" by alleging that they are relying on such documents "to be produced in discovery," *id.*, which is fatal to pleading scienter under the PSLRA.  *In re Bisys Sec. Litig.*, 496 F. Supp. 2d 384, 387 (S.D.N.Y. 2007) (PSLRA requires "plaintiffs to acquire particularized knowledge of a party's *scienter* prior to obtaining discovery") (emphasis in original).  And the allegation that Coinbase made representations about the relationship between WLUNA and Original LUNA and the trading suspension "both publicly and directly to customers" is irrelevant to whether those representations were made with the requisite scienter.  ¶ 104; *see Puchtler* v. *Barclays PLC*, 2025 WL 887502, at *17 (S.D.N.Y. Mar. 21, 2025) ("[S]imple repetition of an allegedly false statement does not indicate that the statement

---

[12]  To the extent that Plaintiffs attempt to fall back on the core operations doctrine, the SAC does not plead any facts showing that WLUNA trading "constitute[d] nearly all of [Coinbase's] business," and even if it did, this "does not independently establish scienter."  *Woolgar* v. *Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 239–40 (S.D.N.Y. 2020) (citation omitted).  *See* MTD Reply Br. at 8.

was made with scienter."), *aff'd*, 2025 WL 3495490 (2d Cir. Dec. 5, 2025) (summary order).

The SAC also fails to allege "facts demonstrating that Defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak*, 216 F.3d at 308. Plaintiffs do not claim that any such contradictory information existed at the time of those statements, or that Coinbase executives received the information but failed to review it. *See In re Qiwi plc Sec. Litig.*, 2023 WL 7283619, at *18 (E.D.N.Y. Nov. 3, 2023) (no scienter absent specific allegations that defendants failed to review or check information).

Instead of remedying Plaintiffs' scienter pleading deficiencies, the SAC undermines any fraudulent inference and suggests a more compelling non-culpable inference: Coinbase reacted to changing market conditions as events unfolded. When Coinbase listed WLUNA, it appropriately described that WLUNA was designed to track the price of Original LUNA, but it was not, in fact, Original LUNA. When Coinbase recognized the volatility in the Terra ecosystem, it publicly announced the suspension of WLUNA trading on May 13, 2022. ¶ 105. Then, when third party Terraform announced that it was launching New LUNA, Coinbase again publicly disclosed that it would "no longer support the Terra Ecosystem and would not be participating in any future token offerings by [Terraform]" on May 20, 2022. ¶ 98. And when Terraform renamed Original LUNA to LUNC in light of the launch of New LUNA, Coinbase too changed the name of WLUNA to WLUNC to avoid confusion and accurately describe the asset. *See* Ex. A at 4. Plaintiffs' alleged inferences of fraud remain nonsensical. Prolonging a suspension where Defendants are alleged to profit from trading[13] undercut their economic self-interest. *See* MTD Reply Br. at 8–9. Nor is there any indication as to how Defendants benefited from inaccurate "internal records and tax forms"—which Plaintiffs admit they generated themselves two years after any of their purchases

---

13    There is no allegation that Defendants profited from keeping their WLUNA—they did not.

or the other challenged statements regarding WLUNA. ¶ 101.

### C.     Plaintiffs Still Fail to Plead Direct and Reasonable Reliance.

The SAC does not invoke the fraud-on-the-market presumption or plead its prerequisites, and therefore must plead that Plaintiffs directly and reasonably relied on the challenged statements. MTD Br. at 20–22.  Plaintiffs still fail to plead reliance for the reasons set out in Defendants' prior briefing.  They do not plead that they purchased or sold WLUNA after May 27, 2022, which is fatal to their claims arising from the WLUNA trading suspension and account statements because merely holding a security does not give rise to a Section 10(b) claim.  *Id.* at 21–22; *see also Blue Chip Stamps* v. *Manor Drug Stores*, 421 U.S. 723, 723 (1975) (Rule 10b-5 plaintiffs "confined to actual purchasers or sellers").  Moreover, even if there were account statement inaccuracies and Plaintiffs did actually rely on them, any reliance was not reasonable because, based on Plaintiffs' own allegations, it was obvious that the inaccuracies were errors.  *See* MTD Br. at 22.

### D.     Plaintiffs Still Fail to Plead That Coinbase's Alleged Misrepresentations Caused Their Losses

The SAC inconsistently describes the losses that Plaintiffs purportedly suffered.  *See, e.g.*, ¶¶ 7–17 (describing each Plaintiff's alleged losses).  But the crux of Plaintiffs' claim is that they are entitled to the peak value of New LUNA issued by Terraform after the original Terraform ecosystem collapsed.  *Id.*  Not only are these purported losses impermissibly speculative, but they are completely untethered to Coinbase's alleged misrepresentations.  *First*, Plaintiffs' claim that Coinbase's misrepresentations, concerning the WLUNA-LUNA "peg" and suspension, caused their losses "relies on a chain of inferences far too speculative and distended" to support loss causation.  *Altimeo Asset Mgmt.* v. *Qihoo 360 Tech Co.*, 663 F. Supp. 3d 334, 368 (S.D.N.Y. 2023).  Even accepting Plaintiffs' theory, Plaintiffs would have had to convert their WLUNA to Original LUNA, and then receive the *same amount* of New LUNA from Terraform in the airdrop, which

depended on Plaintiffs' dates of purchase and Terraform's allocation mechanism. *Second*, Plaintiffs would have incurred the alleged losses irrespective of any inaccuracies in their account statements, which is fatal. *Puchtler*, 2025 WL 887502, at *20 (no loss causation where plaintiff "would have suffered the same loss" regardless of defendants' acts or statements).

### E. Plaintiffs' Claims Remain Time-Barred

None of the facts alleged in the SAC save Plaintiffs' plainly time-barred claims because the facts forming the basis of their claims concerning the purported WLUNA-LUNA peg, the trading suspension and the allegedly inaccurate account statements were reasonably discoverable prior to May 2023. Plaintiffs' renewed attempt to allege that their claims are timely because a court did not hold that WLUNA was a security until December 28, 2023 fails. It is the facts giving rise to the violation that need to be discoverable by a reasonably diligent plaintiff, not whether the conduct is illegal. *See* MTD Br. at 11–12. Plaintiffs' other arguments are unavailing:[14]

***Peg***. Plaintiffs' own pleading shows the claim is time-barred. The SAC pleads that immediately after the May 2022 suspension, Plaintiffs could not convert their WLUNA to Original LUNA and therefore could not obtain New LUNA. ¶¶ 98–100. But Plaintiffs now claim that they could not reasonably discover the relationship between WLUNA and Original LUNA until "expert confirmation" that a purported WLUNA smart contract lacked "pegging/wrapping logic." ¶ 106. But Plaintiffs concede that the token's wrapping logic was "publicly verifiable." ¶ 104.

***Suspension***. By May 2023—a year after the trading suspension—it was reasonably discoverable that the suspension was not temporary. By that point, a year had passed since the WLUNA price "crashed to $0.0001" (and never rebounded), ¶ 93, Terraform launched New

---

[14]  As explained *infra*, at n.1, Plaintiffs added dozens of paragraphs that are nearly entirely copied from a complaint filed in 2022 against a different defendant. ¶¶ 26–92. These are largely irrelevant, but were also reasonably discoverable by June 13, 2022 at the latest.

LUNA, ¶ 99, and Coinbase publicly announced the suspension and that it would not support any future token offerings from Terra, ¶ 98.  Indeed, Plaintiffs fail to allege any facts that they learned after May 2023 that revealed the fraud.[15]  Plaintiffs' claim that "Coinbase representatives . . . repeatedly assured them that the suspension was temporary" is wholly conclusory.  ¶ 3.  There is no allegation regarding when or to whom these statements were made.  *See Verschleiser* v. *Frydman*, 2023 WL 5835031, at *10 (S.D.N.Y. Sept. 7, 2023) (rejecting "vague and conclusory assertions" that misconduct is "ongoing" to reset the statute of limitations).  For the same reason, the two alleged chats attached to the SAC make no difference—one is undated (*see* Ex. G at 83), and neither gives any indication as to whom it was sent, *see id.* at 82–83.

*Account Statements*.  Although Plaintiffs claim that the statements' purported inaccuracies were only reasonably discoverable in 2024, ¶ 106, their prior complaint and briefing suggest that certain Plaintiffs learned of the inaccuracies earlier and Plaintiffs' pleadings are silent as to the remaining Plaintiffs.  *See* FAC ¶ 39; Dkt. 89 at 11 (arguing Coinbase issued "false" tax forms in 2023); *see also In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001) (court need not accept "conflicting pleadings" or allegations "contradicted . . . by statements in the complaint").  Their claims based on the account statements are therefore time-barred.

## II.     Plaintiffs Still Fail to Plead a Section 20(a) Claim

Plaintiffs' Section 20(a) claim should be dismissed with prejudice because they fail to plead for a second time (1) any primary violation, or (2) that Armstrong culpably participated in any fraud.  *See supra* 15–16; MTD Br. at 17–19, 23.

## III.    The SAC Does Not Plead That the User Agreement Is an Unenforceable Contract of Adhesion

---

[15]   The "temporarily disabled" language in screenshots attached to the SAC all appear to be dated May 30, 2022, at the latest, and therefore do not save Plaintiffs' claims.  *See* Ex. G at 84–86.

Counts III–X should be sent to arbitration because the Parties entered into an arbitration agreement and Plaintiffs have not carried their burden to show that agreement is unenforceable.

Defendants' motion to compel arbitration, Dkts. 83, 84, 90, showed each Plaintiff accepted the 2025 Coinbase User Agreement, which includes an arbitration agreement that applies to all claims in this case except, as relevant here, Plaintiffs' securities law claims.[16]  After full briefing on the issue and hearing the Parties, the Court ruled that "the non-securities counts in the [FAC] would, on the current record, likely be referred to arbitration," but gave Plaintiffs a final chance to allege "a basis, if they have one, for asserting that the Coinbase User Agreement is a contract of adhesion so unconscionable as to be unenforceable."  Dkt. 93 at 2.  Plaintiffs have not done so.

Plaintiffs conclusorily assert that the Coinbase User Agreement is a contract of adhesion that is against public policy, ¶ 25, but the SAC includes no factual basis for that statement and there is none.  To the contrary, Plaintiffs plead breach of contract and allege—for the third time in this case—that "Plaintiffs and Coinbase, Inc. entered into a *valid, enforceable contract*, the terms of which are set forth in Coinbase's User Agreement."  ¶ 129 (emphasis added).  Plaintiffs cannot seek damages for breach of contract and simultaneously claim the contract is unenforceable.  *See Tarverdiyeva* v. *Coinbase Glob., Inc.*, 2021 WL 4527960, at *2 (M.D. Fla. Sept. 8, 2021).

Nor is arbitration against public policy.  Congress, via the Federal Arbitration Act ("FAA"), has expressed a "liberal federal policy *favoring* arbitration."  *AT&T Mobility LLC* v. *Concepcion*, 563 U.S. 333, 339 (2011) (emphasis added).  California too "has expressed a *strong public policy in favor of arbitration* as a speedy and relatively inexpensive means of dispute resolution."  *U.S. Life Ins. Co.* v. *Ins. Comm'r of California*, 160 F. App'x 559, 563 (9th Cir. 2005),

---

[16]  Defendants incorporate by reference all arguments and exhibits previously submitted in support of their motion to compel arbitration.

*as amended on denial of reh'g and reh'g en banc* (Jan. 10, 2006) (quoting *Moncharsh* v. *Heily & Blase*, 832 P.2d 899, 902 (1992)) (emphasis added).[17]    Arbitration agreements are presumptively valid and enforceable.  *See Shearson/Am. Express, Inc.* v. *McMahon*, 482 U.S. 220, 226 (1987).

Labelling the Coinbase User Agreement a "contract of adhesion" does not make it unenforceable.  The fact that a contract is offered on a take-it-or-leave-it basis "alone is insufficient to invalidate an arbitration agreement," *Lane* v. *Francis Capital Mgmt. LLC*, 224 Cal. App. 4th 676, 689 (2014), and the "adhesive aspect of a contract is not dispositive on the issue of unconscionability." *O'Donoghue* v. *Super. Ct.*, 219 Cal. App. 4th 245, 258–59 (2013) (cleaned up).    Rather, "[t]here can be no oppression establishing procedural unconscionability, even assuming unequal bargaining power and an adhesion contract, when the customer has meaningful choices." *Wayne* v. *Staples, Inc.*, 135 Cal. App. 4th 466, 482 (2006).  And court after court has rejected the assertion that "Coinbase was [the] only option for crypto currency services" available to investors like Plaintiffs. *E.g.*, *Pearl* v. *Coinbase Glob., Inc.*, 2023 WL 1769190, at *7 (N.D. Cal. Feb. 3, 2023); *Aggarwal* v. *Coinbase, Inc.*, 685 F. Supp. 3d 867, 881 (N.D. Cal 2023) ("[N]othing in the record suggests that Coinbase was Plaintiffs' only option for cryptocurrency services.").    Simply put, the Coinbase User Agreement "does not give rise to procedural unconscionability" that would render the arbitration agreement unenforceable "because Coinbase users were not beholden to the website nor forced to accept its terms." *Cordero*, 2025 WL 2223495, at *7.  Indeed, the Ninth Circuit recognized that, although contracts of adhesion contain "some degree of procedural unconscionability," a prior version of the Coinbase arbitration agreement was enforceable. *See Bielski* v. *Coinbase, Inc.*, 87 F.4th 1003, 1014, 1015 (9th Cir.

---

[17]    California law applies to the Parties' agreement.  Dkt. 84 at 11 n.4.  New York public policy also favors arbitration. *Cnty. of Nassau* v. *Chase*, 402 F. App'x 540, 542 (2d Cir. 2010) ("New York law accords with the policies of the FAA (in favor of binding arbitration)[.]").

2023) ("Ultimately, we hold that the delegation provision's low levels of procedural and substantive unconscionability fail to tip the scales to render the provision unconscionable and therefore unenforceable."). The same is true here. Plaintiffs—despite being afforded every opportunity—have not come forward with any allegation or evidence showing that the Coinbase User Agreement is so procedurally unconscionable as to render it unenforceable.

Even if Plaintiffs could show procedural unconscionability—and they cannot for the reasons discussed above and in Defendants' prior briefing—that alone would not render the arbitration agreement unenforceable. A contract is unenforceable only if it is **both** procedurally and substantively unconscionable. *Sanchez* v. *Valencia Holding Co.*, *LLC*, 61 Cal. 4th 899, 910 (2015). The two forms of unconscionability work as a "sliding scale," such that "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.* (citing *Armendariz* v. *Found. Health Psychare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000)). Where, as here, there is at most minimal procedural unconscionability, a substantial showing of substantive unconscionability is required to invalidate the arbitration agreement. *Sanchez*, 61 Cal. 4th at 910–11. And a contract is substantively unconscionable only when it is so unjustifiably one-sided that it "shocks the conscience." *Chavarria* v. *Ralphs Grocery Co.*, 733 F.3d 916, 923 (9th Cir. 2013).

The SAC does not come remotely close to that standard. The 2025 Coinbase User Agreement is a bilateral agreement that requires both sides to resolve certain disputes, such as those contained in Counts III–X, through arbitration rather than court proceedings. There is nothing conscience-shocking about such a requirement . None of Plaintiffs' prior arguments show otherwise, Dkt. 90 at 8–9, and the SAC adds nothing to the record on this score.

In a last-ditch attempt to avoid arbitration, Plaintiffs purportedly seek "public injunctive

relief" that Plaintiffs assert is not subject to arbitration. ¶ 158 (Count X). The Court did not grant Plaintiffs leave to add new causes of action to the SAC. Dkt. 93. But it makes no difference. Count X does not have any bearing on whether Counts III–IX are subject to arbitration (they are for all the reasons discussed here and in Defendants' prior briefing). And, in any event, Count X does not seek the sort of public injunctive relief that falls outside the scope of arbitration. To the contrary, all of the relief Plaintiffs request in Count X (and in the SAC more generally) would remedy injuries Plaintiffs suffered as Coinbase users or accrue only to the benefit of other Coinbase users. Where, as here, Plaintiffs' "requests stand to benefit only Coinbase customers and not the general public as a more diffuse whole, they are not requests for public injunctive relief." *Woody* v. *Coinbase Glob., Inc.*, 2023 WL 6882750, at \*4 (N.D. Cal. Oct. 17, 2023), *vacated in part on other grounds*, 2024 WL 4532909 (9th Cir. Oct. 21, 2024) (quotations omitted); *see also Hodges* v. *Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 549 (9th Cir. 2021) (explaining that relief which benefits a "group of individuals similarly situated to the plaintiff" cannot "be said to *primarily* benefit the general public as a more diffuse whole"). The addition of Count X thus has no bearing on the enforceability of the Parties' arbitration agreement.[18] In sum, the SAC pleads no basis "for asserting that the Coinbase User Agreement is a contract of adhesion so unconscionable as to be unenforceable." Dkt. 93 at 2. Thus, the Court should grant the motion to compel arbitration for all non-securities claims (Counts III–X). *Id.*

## CONCLUSION

For the foregoing reasons, Counts I and II against all Defendants should be dismissed with prejudice and Defendants' motion to compel arbitration of the remaining claims should be granted.

---

[18]    Because the Court did not grant Plaintiffs leave to add this new claim, Defendants respectfully request leave to respond if Plaintiffs raise new arguments in their supplemental brief.

Dated:    April 3, 2026

PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP

By:    */s/ Randall Scott Luskey*

Randall Scott Luskey (admitted *pro hac vice*)

535 Mission Street
San Francisco, CA 94105
Telephone: (628) 432-5100
rluskey@paulweiss.com

Paul D. Brachman
2001 K Street, NW
Washington, DC 20006
Telephone: (202) 223-7300
pbrachman@paulweiss.com

Kristina A. Bunting
Michael J. Pisem
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
kbunting@paulweiss.com
mpisem@paulweiss.com

*Attorneys for Defendants Coinbase, Inc.,
  Coinbase Global, Inc. and Brian Armstrong*

## WORD COUNT CERTIFICATION

I hereby certify that the foregoing document complies with the word count limit set forth in Local Civil Rule 7.1.  I relied on the word count of the word-processing system used to prepare the document.  The total number of words in this document, exclusive of the caption, table of contents, table of authorities, and signature block, is 8,316 words.

*/s/ Randall Scott Luskey*
Randall Scott Luskey
