UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

JOEL HEABEART, JOEL MILLER,
KYLE KELLEY, JUSTIN MORAN,
MARÍA CECILIA LUCANERA, NOEL
YOUNT, ISRAEL ALATRIZ, AARON
DUNCAN, DYLAN MICHAUD, JAMES
MICHAEL SMITH, and EDWARD C.
TOAL.,

          Plaintiff,

v.

COINBASE, INC., COINBASE GLOBAL, INC.,
BRIAN ARMSTRONG, and
DOES 1–100,

          Defendants.

------------------------------------------------

Case No.: 1:25-cv-09197-JSR

Honorable Jed S. Rakoff

## **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' SUPPLEMENTAL MOTION TO DISMISS AND MOTION TO COMPEL ARBITRATION**

Bulldog Law, P.C.
Mario Tafur (admitted *pro hac vice*)
500 N. Central Ave. Ste. 610
Glendale, CA 91203
Telephone: (818) 646-8990
mario@thebulldog.law

Philip R. Berwish
Berwish Law
2 Anderson Lane
Princeton, NJ 08540
Telephone: (800) 547-8717
berwish@gmail.com
*Attorneys for Plaintiffs*

**PRELIMINARY STATEMENT**

Defendants' Supplemental Memorandum (Doc. 100) merely repeats the arguments the Court already found insufficient when it granted leave to amend the First Amended Complaint. It ignores the new, particularized allegations and exhibits in the Second Amended Complaint ("SAC"). The SAC cures the deficiencies the Court identified, pleads actionable misstatements, raises a strong inference of scienter, and adequately alleges reasonable reliance and loss causation, and are fully compliant with the Private Securities Litigation Reform Act [PSLRA]. Defendants' attempts to recharacterize the facts and distinguish the SAC from controlling precedent are unavailing, and in several instances support Plaintiffs' arguments.

Plaintiffs' incorporate by reference the Plaintiffs' Opposition To Defendant's Supplemental Motion And Memorandum In Support Of Its Motion To Dismiss, To Compel Arbitration, And To Stay Proceedings, filed contemporaneously herewith on April 10, 2026, Plaintiffs Opposition To Defendant's Motion To Dismiss, dated October 14, 2025, [Doc 65, filed with USDC of Northern California], Plaintiffs Opposition To Defendants Motion To Compel Arbitration And Stay Proceedings, dated January 30, 2026, [Doc 88, filed with the USDC, SDNY], and Plaintiff's Memorandum Of Law In Opposition To Defendant's Motion To dismiss Counts I And II of Plaintiffs Amended Complaint, dated January 30, 2026 [Doc 89, filed with USDC, SDNY], as if expressly rewritten herein.

Plaintiffs further incorporate rate by reference their Opposition to Defendants' Motion to Strike Exhibit A (von NotHaus Report – hereafter, "the Report"), filed contemporaneously herewith.

## ARGUMENT

I.    **The SAC Pleads Actionable Misstatements**
      **(Contrary to Defendants' Argument at pp. 9–13)**

1.    Defendants claim the SAC still fails to plead actionable misstatements regarding the peg,

2

suspension, and account statements. Each argument fails.

### A. The Peg Statement Was False And Materially Misleading

2.     Coinbase's August 2021 listing announcement (Exhibit D to the SAC) stated: "Wrapped Luna (WLUNA) is an Ethereum token that's intended to represent Terra (LUNA) on the Ethereum blockchain. Through a WLUNA partner, 1 LUNA can be exchanged for 1 WLUNA, and vice-versa." This statement affirmatively represented that WLUNA was designed to track LUNA's value on a 1:1 basis through an enforceable mechanism, which is communicated through the use of the "wrap" or "wrapped" moniker.  In reality, the WLUNA smart contract at `0xd2877702675e6ceb975b4a1dff9fb7baf4c91ea9` contains no wrapping, bridging, lock-and-mint, burn-and-release, or peg enforcement logic whatsoever. The promised 1:1 exchange was never part of the immutable smart contract; unlike other wrapped cryptocurrencies, WLUNA had no direct relationship with the native LUNA token. Wrapped tokens maintain a smart-contract-enforced 1:1 peg with their native token.  That did not exist here which did not exist here between LUNA and WLUNA.  When Coinbase stated there was a 1:1 peg between WLUNA and LUNA this was at worst an intentional misrepresentation, and at the least a reckless one.  Coinbase continues to perpetuate this fallacy to this day by using the term "Wrapped" LUNA.[1]

3.     In the cryptocurrency industry, the term "wrapped" is standard shorthand for a token that is designed to track the value of a native asset on a 1:1 basis through smart-contract logic, while taking advantage of the Ethereum blockchain's functionality.  It is not required to target the Ethereum blockchain, but that is the most common.  Coinbase's explicit labeling of WLUNA as "Wrapped Luna" and its representation that "1 LUNA can be exchanged for 1 WLUNA, and vice-versa," led users to reasonably believe WLUNA was technically engineered to mirror LUNA's value on-chain

---

[1] https://www.coinbase.com/price/wrapped-luna-classic

and was truly "wrapped". However, WLUNA smart contract contained no such wrapping, bridging, or peg-enforcement code. Coinbase never disclosed this critical distinction. Moreover, this is a material misstatement of fact by Coinbase on which the Plaintiffs reasonably relied.

4.      The meaning of the term "wrapped" as related to cryptocurrency can be traced to 2019 white paper called "Wrapped Tokens," which defined a practice that was already in place, but had not been clearly defined.  "Wrapped tokens are ERC-20 tokens that are backed 1:1 by a native cryptocurrency from another blockchain. They allow users to move value across chains without selling the original asset, enabling the wrapped token to be used in decentralized applications (dApps) on the target chain." [2]

5.      What is clear from Coinbase's description of WLUNA and the definition recognized by the industry, is that a wrapped token retains the value of the native token and makes it available on blockchains other than its native blockchain.  Coinbase states explicitly that WLUNA is designed to track LUNA's value, exactly how a wrapped token should.  WLUNA was also created in order to be used on Ethereum's decentralized applications, also just like other wrapped tokens.  This was explicitly stated by Coinbase in its August 2021 announcement regarding WLUNA, and elsewhere. This was necessary because LUNA was native to the Terra blockchain and could not be sent to an Ethereum wallet using the Ethereum blockchain.  Wrapping LUNA allowed it to be used on the Ethereum blockchain.  In every way, Coinbase promoted WLUNA as typical wrapped token. Plaintiffs reasonably relied on all of the information Coinbase was providing, especially given the fact that Coinbase was one of the largest cryptocurrency exchanges in the world and understood very clearly what is meant by a wrapped token.

6.       Defendants offer statements and exhibits confirming that WLUNA was not LUNA, but was

---

[2] Wrapped Tokens:  https://www.wbtc.network/assets/wrapped-tokens-whitepaper.pdf

in fact a different token.  Not only is this true of all wrapped tokens in relation to the token they represent, it is true of WLUNA.  There is no allegation that WLUNA is LUNA.  The allegation is that Coinbase represented WLUNA as a wrapped token, when in fact it was not wrapped as is understood in the industry.  This is a material misrepresentation.  The impact of this misrepresentation is no small matter.  Because the WLUNA smart contract never contained any on-chain 1:1 peg, wrapping logic, lock-and-mint mechanism, or burn-and-release function, every WLUNA token was not a true economic equivalent of native LUNA. It was, in substance, an unbacked ERC-20 IOU whose only redemption path was an off-chain promise controlled by Terraform Labs. Coinbase's repeated representations that WLUNA was "Wrapped Luna" with a 1:1 exchange mechanism therefore caused Plaintiffs to purchase and hold what was, in effect, "fake LUNA" — a token marketed and priced as though it possessed the identical rights and value of native LUNA when, in reality, it did not. This fundamental misrepresentation is material as a matter of law because a reasonable investor would have understood Coinbase's statements to mean that WLUNA was backed by an enforceable smart-contract peg rather than a revocable, discretionary bridge controlled by the very entity whose collapse later destroyed the token's value.  TFL could ignore all of the WLUNA in existence, because it really did not affect LUNA unless TFL wanted it to.  It is highly unlikely that Coinbase given its expertise in the area of cryptocurrency as well as the technical due diligence and work it would have to do to mount WLUNA onto the Coinbase platform would have demonstrated the lack of any coding creating the 1:1 peg with a LUNA token for each WLUNA.  WLUNA lacked the fundamental characteristics Coinbase represented as possessing, rendering it materially different from what investors were led to believe. Contrary to Coinbase's representations, WLUNA never had any real or intrinsic value because its continued existence depended entirely on the discretion of Terraform Labs ("TFL"), rather than on any enforceable

smart-contract-based peg or automated mechanism that could maintain parity with LUNA. As a result, investors were misled regarding the nature, stability, and risk profile of WLUNA.  Coinbase reinforced this misrepresentation that WLUNA was wrapped LUNA as understood in the industry, and then further harmed Plaintiffs on May 20, 2022, taking away their ability to position themselves to take advantage of the airdrop, which did not violate a smart contract between LUNA and WLUNA, because it never existed.  TFL created WLUNA to be under its full control and discretion. When it mattered most, Coinbase made sure that its WLUNA account holders after May 20, 2022, would not be able to even have the opportunity for TFL to exercise that discretion.

7.      Defendants' reliance on the timing of the statement (pre-New LUNA) and the phrase "Separate ERC-20 token" does not cure the misleading nature of the representation. A reasonable investor would understand Coinbase's statement to mean WLUNA was technically equivalent to LUNA with an on-chain 1:1 mechanism. The SAC pleads this with particularity (¶¶ 3, 95, 105). Defendants cite *Rombach v. Chang* (355 F.3d 164 (2d Cir. 2004), but *Rombach* actually supports Plaintiffs: the test is whether the statements, "taken together and in context, would have misled a reasonable investor." Id. at 172 n.7.  Here, statements were clearly false and misleading to a reasonable investor in cryptocurrencies.

### B. The Suspension Statement Was Misleading

8.      Defendants argue that "suspension" does not imply "temporary" and that Plaintiffs' Exhibit G (customer text messages) is insufficient. The SAC and Exhibit G directly contradict this. For Defendants' argument to make sense, the term "temporary" must have multiple meanings. Nonetheless, the term temporary only has one generally accepted meaning; a state of persisting for a prescribed period of time.  In Exhibit D of the SAC, Coinbase indicates to a user that "[c]onverting WLUNA is temporarily disabled." (Ex. D, SAC, p. 139) This is around May 30, 2022.  The

statement presumably refers to the trading suspension, and not to the May 20, 2022, statement as the May 20 statement did not give any indication that ending support for the Terra ecosystem by Coinbase was temporary.  However, the Exhibit G contains contemporaneous text messages from Coinbase representatives to Plaintiffs repeatedly assuring them that the suspension was "temporary". Defendants' attempt to dismiss Exhibit G as lacking context fails; the texts are between Coinbase and the named Plaintiffs and are attached as exhibits to the SAC and take place during the timeframe in question.  At minimum, it is an issue of fact for the jury and, at this stage, all inferences must be drawn in favor of Plaintiffs as the non-moving party. Exhibit G reflects a party admission.

9.      Moreover, Coinbase never corrected its "temporary" messaging after the May 20, 2022, quiet infrastructure shutdown that all but eliminated Coinbase users' ability to interact with the Terra ecosystem, shutting them out of the LUNA 2.0 airdrop.

10.     Coinbase's May 20, 2022, announcement (Luskey Declaration Ex. 4) that it would wind down support for the Terra ecosystem and discontinue support for the existing Terra chain was posted only on its low-visibility Coinbase Cloud corporate account. This announcement received no direct customer notice or guidance to WLUNA holders on how to unwrap or migrate their tokens for the impending LUNA 2.0 airdrop. Nor did the announcement warn Coinbase account holders that this action could significantly impact their ability to manage WLUNA in the face of the LUNA's collapse.  Coinbase, not Terraform Labs, made the decision to exit the Terra ecosystem. At the time, Coinbase knew (from its prior investment in TFL and participation in planning discussions) that WLUNA holders would require interaction with Terra's bridging tools to convert to LUNA or participate in the airdrop. By disabling infrastructure, Coinbase effectively prevented its users from exercising those rights.

   C.  *The Migration Guide (Luskey Declaration - Exhibit 5) Does Not Mention WLUNA*

11.     Defendants repeatedly cite the Terra "Exchange Migration Guide" (Luskey Declaration Ex. 5) as evidence that Plaintiffs had a path to participate in the airdrop. The Guide does not mention WLUNA, WLUNC, or Coinbase users at all. It addresses only exchanges that supported the native chain or that might participate in the LUNA 2.0 airdrop. It provides no instructions for WLUNA holders on Coinbase of any kind. Again, at this stage, all inferences must be drawn in favor of Plaintiffs as the non-moving party.

12.     This omission directly supports Plaintiffs' loss-causation theory. Coinbase's May 20 shutdown left retail users with no practical path to the airdrop. Coinbase users not only would have had to compete with the mad rush by WLUNA holders to participate in the airdrop, but they would have done so while Coinbase blocked trading and transfers out of their WLUNA wallets, even though Coinbase explicitly stated that such transfers would be possible even after the May 27, 2022, trading suspension. It is notable that this was stated explicitly by Coinbase Support staff on March 27, 2026, in a letter to responding to questions about replacement valuations, and states as a "key point" that "[u]sers could still store, send, and receive WLUNA and UST, but trading was no longer possible." (Ex. F, SAC, page 79).  This is directly contradicted by the May 30, 2022, note from the user indicating that actions with WLUNA were "temporarily disabled".  Even in March 2026, Coinbase maintained that users could still "store, send and receive WLUNA," however this simply was not the case.  Plaintiffs attempted to transfer their WLUNA holdings, but were unable to do so. Coinbase could have clarified that along with the trading suspension, the May 20 announcement may have also affected their ability to interact with the Terra ecosystem.  However, Coinbase decided to keep that action as quiet as possible, in order to prevent widespread knowledge that Coinbase intentionally interfered with Coinbase account holders' ability to participate in the TFL airdrop of LUNA 2.0. Coinbase concealed this fact in its communications with Plaintiffs in apparent effort to

maximize confusion among WLUNA holders, for the benefit of Coinbase.

13.     Technically, WLUNA holders could have participated in the LUNA 2.0 airdrop. They would first need to transfer their WLUNA tokens out of their Coinbase wallet to a personal, non-custodial Ethereum wallet. From that external wallet, they could then use Terraform Labs' official bridging or migration tools to unwrap or convert the WLUNA into native LUNA on the Terra blockchain. Only after completing that process could they position themselves to receive the New LUNA airdrop.

14.     However, Coinbase's May 20, 2022, action made this path impossible for its customers. On that date, Coinbase quietly disabled key infrastructure supporting the Terra ecosystem. This shutdown prevented users from transferring WLUNA out of their Coinbase accounts to external wallets. In addition, Coinbase users would have to use third party nodes to move the WLUNA and pay gas fees.  Gas fees are the transaction fees paid by users on certain blockchain networks (including Ethereum) to have their transactions processed and confirmed by the network.  They compensate validators who use computing power to verify transactions and secure the blockchain. Gas fees can spike dramatically during high network congestion, the collapse of LUNA for example would be an example of high network congestion. After the collapse of LUNA, Coinbase users found that the gas fees exceeded the value of their WLUNA. One user brought this up, and a Coinbase support person simply stated that the gas fees essentially are what they are and ignores the user's question related to the fact that the fees to move their WLUNA are higher than the value of the WLUNA they want to transfer.[3]

---

[3] Jaikerzjake chat with Coinbase Support on Reddit Two years ago:
https://www.reddit.com/r/Coinbase/comments/x4vvim/comment/imytpji/



The restriction remained in place even though Coinbase had previously told customers that transfers would still be available after the May 27 trading suspension.

15.     Defendants repeatedly point out that LUNA was not WLUNA and that it is a separate token. This is true of all wrapped tokens and is not in dispute. Many wrapped tokens require a redemption process involving a "partner." For example, WBTC must be sent to BitGo, which then releases native BTC. This fact does not distinguish WLUNA; it underscores the market confusion Coinbase created by falsely describing WLUNA as a "wrapped" token despite the absence of any 1:1 smart contract peg to LUNA.

16.     Defendants further note that Coinbase indicated converting WLUNA to LUNA would require a "WLUNA partner." Coinbase never disclosed that this partner was Terraform Labs (in whom Coinbase had invested) and that it was the only partner capable of performing the conversion.

Coinbase then undercut its own statement by disassociating from the Terra ecosystem on May 20, 2022, significantly impacting users ability to access that "partner". After that date, users had to find an alternative route themselves, not through Coinbase, to transfer WLUNA out of their Coinbase accounts before they could engage TFL's tool to convert WLUNA to LUNA in order to participate in the airdrop.

## II.    The SAC Pleads Strong Scienter
### (Contrary to Defendants' Argument at pp. 13–18)

17.    Defendants erroneously claim the SAC fails to plead motive or conscious misbehavior. The SAC pleads both.

### A.  Motive and Opportunity

18. Coinbase Ventures' $25 million investment in TFL in January 2021, followed by Coinbase's decision to list WLUNA months later in August 2021 as a wrapped token when it in fact was not wrapped, and Coinbase Cloud's participation in the May 12, 2022 war-room chat (where they learned Do Kwon's exact LUNA 2.0 fork and airdrop plans), together with the May 2022 depegging event, gave Coinbase both motive and actual knowledge. *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000) (motive plus conscious avoidance suffices).  In *Novak*, the Second Circuit held that the PSLRA adopted the pre-existing Second Circuit "strong inference" standard for pleading scienter under Section 10(b) and Rule 10b-5.  The court further held that a "strong inference" of scienter can be established by alleging facts that show either: (1) conscious misbehavior or recklessness, or (2) motive and opportunity to commit fraud plus strong circumstantial evidence of conscious misbehavior or recklessness. (*Id*.)  The district court in *Novak v. Kasaks* dismissed the complaint with prejudice, holding that plaintiffs' allegations, that AnnTaylor executives made favorable statements to analysts while knowing or recklessly disregarding that "much of their inventory was worthless or seriously overvalued", failed to plead facts giving rise to a strong inference of scienter.

(997 F. Supp. 425, 430–31 (S.D.N.Y. 1998)). The court specifically found that the complaint lacked "sufficient specificity that at the time the AnnTaylor defendants made favorable statements … they were aware that much of their inventory was worthless or seriously overvalued, or were reckless as to whether that was the case." *Id*. The Second Circuit reversed, holding that those very same facts, when combined with particularized allegations from confidential sources and circumstantial evidence of conscious misbehavior, did satisfy the PSLRA's "strong inference" standard. (*Id*.) Coinbase's alleged conduct far exceeds the threshold the Second Circuit found sufficient in *Novak*. Here, Plaintiffs allege that Coinbase (1) invested in Terraform Labs in January 2021 and received native LUNA tokens; (2) participated in a May 12, 2022 war-room chat in which it learned of Do Kwon's plans for the LUNA 2.0 airdrop and the impending snapshot dates; (3) on May 13 announced a trading suspension effective May 27 while quietly disabling all Coinbase Cloud support for the Terra ecosystem on May 20 (with essentially no customer notice); (4) continued to represent WLUNA as a "wrapped" token with a 1:1 peg despite knowing the WLUNA smart contract contained no wrapping, bridging, or peg-enforcement logic whatsoever (the Report, SAC Ex. A), and (5) the indictment and subsequent conviction of Do Kwon specifically for his fraudulent behavior related to the Terra ecosystem, which includes the following tokens:  LUNA, UST and WLUNA, brings all of Coinbase's actions related to TFL tokens into question given their own misstatements and investment into Terraform Labs. The fact that Coinbase itself either intentionally or recklessly referred to WLUNA as a wrapped token, misled investors into thinking trade suspension was temporary, and significantly interfered with account holders' ability to manage their WLUNA holdings, all underline affirmative acts by Coinbase, create a far stronger inference of conscious misbehavior or recklessness than the inventory-valuation allegations the Second Circuit deemed adequate in *Novak*.  It is important to note that Terraform Labs created WLUNA precisely because it

12

would boost demand for native LUNA by making it far more attractive to investors and users. By advertising WLUNA as "wrapped" LUNA ERC-20 token on Ethereum, TFL enabled LUNA holders to access the vastly larger Ethereum DeFi ecosystem, including lending protocols, decentralized exchanges, yield farms, and collateralized borrowing, without having to sell their native LUNA holdings. This cross-chain utility was intended to increase overall demand for LUNA, drive up its price, and support the broader Terra/UST algorithmic stablecoin flywheel. Coinbase's own August 11, 2021, announcement acknowledged this purpose when it stated that "WLUNA was created to allow LUNA holders to trade, hold, and participate in decentralized finance ('DeFi') apps on Ethereum." By marketing WLUNA as a "wrapped" token with a 1:1 exchange mechanism, both TFL and Coinbase created the reasonable expectation among investors that the token would function as a seamless bridge to Ethereum DeFi while preserving LUNA's value, an expectation that the WLUNA smart contract itself never supported, however the announcement had the desired effect – a rise in the price of LUNA that persisted until early April 2022.

This chart shows the price of LUNA on August 5, 2021 of $14.55.



This chart  below shows the price of LUNA on Augst 12, 2021 of $16.80



This chart below shows the price of LUNA 120 days after the announcement of 66.53 a 457% rise

from the August 5, 2021, pre-announcement price of 14.55 on August 5, 2021.  On March 17, 2022,

TFL took further action to increase the value of LUNA by offering 20% APY on deposits of UST

offered by Anchor Protocol, which was built on the Terra blockchain and was a TFL project.[4]



The rise in price finally ended on April 7, 2022, when LUNA came in over $103.  The price began

---

[4] Anchor Protocol announces 20% APY https://medium.com/anchor-protocol/anchor-protocol-launches-as-the-benchmark-rate-of-defi-4b15689633c0

declining in concert with the destaking of UST from Anchor Protocol beginning in April and culminating May 7-10, 2022, when $2 billion worth of UST was destaked from Anchor Protocol. It is important to note that TFL took the action to list WLUNA on Coinbase, and then to later through Anchor pay high interest rates on deposits after Do Kwon was aware the algorithmic stable coin experiment of LUNA-UST was not sustainable. The listing of WLUNA on Coinbase also inured to Coinbase's direct benefit as a holder of LUNA tokens, as well as having invested in TFL, as the price of LUNA rose steadily afterward.

19.     Coinbase put its own interests, and the interests of TFL, before the interests of its users and used its position as custodian of their assets to further its and possibly TFL's interests.

### B. Conscious Avoidance / Recklessness

20.     Coinbase watched the April/May 2022 destaking of UST from Anchor Protocol and subsequent death spiral in real time from May 7-10, 2022, two days later participated in the May 12 war-room telegram chat which Coinbase did not disclose, announced the suspension on May 13, then quietly disabled all Terra infrastructure on May 20, with full knowledge that this was the worst time to disrupt Coinbase WLUNA holders ability to access a WLUNA partner, all with almost zero customer notice or guidance. This sequence, coupled with the facts that (1) Coinbase falsely advertised WLUNA as a wrapped token, (2) Coinbase likely received LUNA 2.0 from the airdrop on its own native LUNA tokens acquired through its January 2021 investment in TFL which would have been potentially worth more by limiting selling pressure on LUNA 2.0 by reducing the number of wallets participating in the airdrop, raises a strong inference of intentional reckless acts and/or omissions, and self-dealing. This is especially true given the fact that the native LUNA that Coinbase received from TFL when it made its January 2021 was eligible for the airdrop, and Coinbase may in fact have received LUNA 2.0.

*21.*     Defendants' cited cases (*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) and *Maloney v. Ollie's*, 518 F. Supp. 3d 772 (S.D.N.Y. 2021)) are inapposite and distinguishable. Those cases involved generic corporate motives or the complete absence of specific contradictory information. The court in *Kalnit v. Eichler* affirmed dismissal of the complaint, holding that plaintiffs' allegations of scienter, based on defendants' generalized motives to achieve a "superior agreement" in a merger and to avoid personal liability, failed to plead facts giving rise to a strong inference of scienter. (264 F.3d 131, 139–40 (2d Cir. 2001)). The court specifically found those motives "too speculative and conclusory" because they did not demonstrate any concrete personal benefit to the defendants at the expense of shareholders and lacked strong circumstantial evidence of conscious misbehavior or recklessness. *Id.* Similarly, the district court in *Maloney v. Ollie's Bargain Outlet Holdings, Inc.,* dismissed the complaint for failure to plead scienter, ruling that allegations of defendants' access to internal daily sales reports and inventory data were insufficient where the complaint "fail[ed] to specify exactly what information was contained in the report or how said information contradicted Defendants' public statements." (518 F. Supp. 3d 772, 780–81 (S.D.N.Y. 2021)). Coinbase's conduct far exceeds the threshold these courts found insufficient. Here, Plaintiffs allege that Coinbase (1) invested in Terraform Labs in January 2021 and received native LUNA tokens; (2) participated in a May 12, 2022 war-room chat in which it learned of Do Kwon's plans for the LUNA 2.0 airdrop and the impending snapshot dates; (3) on May 13 announced a trading suspension effective May 27 while quietly disabling all Coinbase Cloud support for the Terra ecosystem on May 20 (with no customer notice); and (4) continued to falsely represent WLUNA as a "wrapped" token with a 1:1 peg despite knowing the WLUNA smart contract contained no wrapping, bridging, or peg-enforcement logic whatsoever (the Report, SAC Ex. A). These particularized facts create a far stronger inference of conscious misbehavior or recklessness than the generalized motives and vague

16

internal-knowledge allegations rejected in *Kalnit* and *Maloney*.

### III.    Reliance and Loss Causation Are Adequately Pleaded
     (Contrary to Defendants' Argument at pp. 19–20)

22.    Plaintiffs plead direct and reasonable reliance on Coinbase's 1:1 peg representation (SAC ¶¶ 3, 95, 105) and on its assurances of a "temporary suspension" (SAC ¶ 3 & n.1; Exhibit G). Plaintiffs continued to hold WLUNA in the reasonable expectation that trading would be reinstated and that they would be able to participate in the airdrop. Defendants' reliance on *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) is misplaced; Plaintiffs are purchasers who held based upon misrepresentations. Plaintiffs' ability to transfer their assets was intentionally curtailed by Coinbase. The Supreme Court in *Blue Chip Stamps* held that a private damages action under Rule 10b-5 is confined to actual purchasers or sellers of securities, thereby barring claims by non-purchasers who were allegedly deterred from buying due to misleading statements. (*Id*. at 747). The Court expressed concern about the potential for vexatious litigation and the speculative nature of claims brought by parties who never actually transacted in the security. (*Id*. at 739–41) Coinbase's alleged conduct is readily distinguishable and far exceeds the limitations imposed by *Blue Chip Stamps*. Here, all Plaintiffs purchased WLUNA on Coinbase's platform and continued to hold their tokens in reliance on Coinbase's material misrepresentations that WLUNA was a "wrapped" token with a 1:1 exchange mechanism to native LUNA. Plaintiffs further allege that Coinbase, after participating in the May 12, 2022 war-room chat and learning of the LUNA 2.0 airdrop and snapshot dates, quietly disabled all support for the Terra ecosystem on May 20 and imposed a trading suspension effective May 27 without any notice or guidance to customers on how to withdraw and unwrap their WLUNA to participate in the airdrop. These particularized allegations by actual purchasers who relied on Coinbase's statements about the very asset they bought place this case squarely within the core of what *Blue Chip Stamps* permits and the PSLRA.

23.    Loss causation is pleaded through (1) the non-existence of the 1:1 peg, (2) the May 20 infrastructure shutdown, and (3) the lack of customer notice, all of which prevented participation in the LUNA 2.0 airdrop, the only recovery mechanism after the collapse. The Terra Migration Guide (Luskey Dec. Ex. 5) does not mention WLUNA and therefore does not negate causation. It is addressed to exchanges managing native-chain LUNA and provides no instructions whatsoever for WLUNA holders. It confirms that TFL expected exchanges to handle the transition and airdrop on behalf of their customers, precisely what Coinbase refused to do.   In a blog post, Terra lists the exchanges supporting the conversion to LUNA and airdrop.  They include:  Binance, Bitfinex, Bitget, Bitmart, Bitrue, Buenbit, Bybit, Coinmetro, Coinane, Crypto.com, FTX, Gate.io, GOPAX, Hoo, Huobi, Kraken, Kucoin, Lbank, Lemoncash, Let's Bit, MEXC, Nexo, Okcoin, OKX, Tiendacrypto, and Upbit.[5]  Conspicuously missing is Coinbase, the only one that is an investor in Terraform Labs.

### IV.    Claims Are Not Time-Barred
### (Contrary to Defendants' Argument at pp. 20–21)

24.    The SAC pleads fraudulent concealment until at least August 30, 2024 (when tax-report discrepancies were publicly revealed on X) and the Report's forensic confirmation in 2025–2026. SAC ¶¶ 4–5. Defendants' reliance on the public nature of the suspension ignores the private customer texts in Exhibit G clearly stating the suspension was temporary and the complete lack of notice regarding the May 20 shutdown. Once again, at this stage, all inferences must be drawn in favor of Plaintiffs as the non-moving party.

25.    It was not until Do Kwon's March 2023 indictment, and the subsequent trial revealing $40 billion in investor losses, that Plaintiffs had reason to suspect Coinbase may have engaged in fraudulent behavior tied to the LUNA collapse. A reasonable person might have learned of the

---

[5] Terra Blogpost May 25, 2022:  https://medium.com/terra-money/terra-2-0-luna-airdrop-cd08a6d9cfcd

indictment within six months (by September 2023). Plaintiffs' action, filed in March 2025, falls well within the two-year statute of limitations.

**V.    Section 20(a) Claim Is Adequately Pleaded**

26.    Because the primary § 10(b) claim survives, the § 20(a) claim against Coinbase Global and Armstrong also survives.

**VI.    The User Agreement Is Not Enforceable as to Public Injunctive Relief**

27.    The SAC pleads public injunctive relief under *McGill v. Citibank*, N.A., 2 Cal. 5th 945 (2017) and *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122 (9th Cir. 2013). This renders the arbitration clause unenforceable as to those claims. Defendants' cited cases (*Cordero v. Coinbase, Inc.*, 2025 WL 2223495 (N.D. Cal. Aug. 5, 2025)) are distinguishable because they did not involve public injunctive relief aimed at systemic misrepresentations.  The court in *Cordero v. Coinbase, Inc.* granted Coinbase's motion to compel arbitration, holding that the arbitration agreement, including the class-action waiver, was enforceable and not unconscionable despite plaintiffs' arguments that the waiver violated California law and that the high cost of arbitration prevented effective vindication of their claims. (*Cordero v. Coinbase, Inc.*, 2025 WL 2223495, at *4–7 (N.D. Cal. Aug. 5, 2025)). Coinbase's alleged conduct in this action is readily distinguishable and presents far stronger grounds for finding the arbitration clause unenforceable. Unlike the straightforward fee-disclosure claims in *Cordero*, Plaintiffs here allege that Coinbase (1) invested in Terraform Labs in January 2021 and received native LUNA tokens; (2) participated in a May 12, 2022 war-room chat in which it learned of Do Kwon's plans for the LUNA 2.0 airdrop and the impending snapshot dates; (3) quietly disabled all Coinbase Cloud support for the Terra ecosystem on May 20, 2022 (with essentially no notice to customers); (4) announced a trading suspension effective May 27 while continuing to falsely represent WLUNA as a "wrapped" token with a 1:1 peg despite knowing the

WLUNA smart contract contained no wrapping, bridging, or peg-enforcement logic whatsoever (the Report, SAC Ex. A); and (5) thereby prevented Plaintiffs from participating in the airdrop. These particularized allegations of deliberate concealment, scienter, and fraud in connection with a multi-billion-dollar crypto collapse render the arbitration clause substantively unconscionable and support claims for public injunctive relief that fall outside the scope of private arbitration.

### VII.    The Coinbase Agreement Is Unenforceable And Unconscionable As A Contract of Adhesion

28.    The Coinbase User Agreement, an online seventy (70) page single spaced document, is a classic oppressive, one-sided contract of adhesion. It is a standardized form drafted by Coinbase, presented on a take-it-or-leave-it basis with no opportunity for negotiation, and offered to millions of retail customers with vastly unequal bargaining power. Under California law, such contracts are scrutinized for unconscionability. *Sanchez v. Valencia Holding Co.*, LLC, 61 Cal. 4th 899 (2015); *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916 (9th Cir. 2013). The arbitration provision is both procedurally and substantively unconscionable.

29.    The agreement is procedurally unconscionable due to the "fine print" nature of the seventy (70) page length and absence of flagging the waiver of substantive rights. The agreement is substantively unconscionable because the terms (waivers) are unreasonable. The purpose of "the unconscionability doctrine is to prevent unfair surprise and oppression" *Clinton v. Oppenheimer & Co.*, 824 F. Supp. 2d 476, 483 (S.D.N.Y. 2011); also see Restatement (Second) of Contracts § 208 (1981); *Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377 (S.D.N.Y. 2002)

30.    The waiver and arbitration provisions are buried in an extremely lengthy and complex agreement that customers must accept to use the platform, and it waives substantive rights such as class actions and public injunctive relief while requiring individual arbitration in a forum Coinbase controls. The waivers of substantive rights are not emphasized in any way, by color, font, or bold

text. These features render the clause unenforceable. Plaintiffs do not waive this argument; the SAC references the User Agreement and its forum-selection and arbitration provisions (see SAC ¶ 6 & Exhibit B), and failure to raise unenforceability now would waive the issue.

31.     The agreement is substantively unconscionable because the terms of the agreement allows Coinbase to modify it at any time. That fact, in particular, is unconscionable because it could bind customers to a contract term they had never seen. *Clinton*, supra.

32.     The case of *Eisen v. Venulum Ltd.* 244 F. Supp. 3d 324 (W.D.N.Y. 2017), held that the arbitration clause forced the plaintiff to "forgo any application of . . . federal law protections provided to him" by U.S. securities laws, which was enough to make the arbitration provision unconscionable and void. *Id*. at 344–45

33.     The unenforceability of the oppressive adhesion contract renders the claim for mandatory arbitration unenforceable and a nullity.

34.     "In determining the conscionability of a contract, no set weight is to be given any one factor; each case must be decided on its own facts" (*State of New York v Wolowitz*, 96 AD2d 47, 68 [1983]). "However, [in general, it can be said that] procedural and substantive unconscionability operate on a sliding scale; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa" (*Simar Holding Corp. v GSC*, 87 AD3d at 690 [internal quotation marks omitted]). " 'The determination of unconscionability is a matter of law for the court to decide' " (id., quoting *Industralease Automated & Scientific Equip. Corp. v R. M. E. Enters*., 58 AD2d 482, 488 [1977]). " 'Where there is doubt . . . as to whether a contract is fraught with elements of unconscionability, there must be a hearing where the parties have an opportunity to present evidence with regard to the circumstances of the signing of the contract, and the disputed terms' setting, purpose and effect' " (*Simar Holding Corp. v GSC*, 87 AD3d at 690, quoting *Davidovits v De*

21

*Jesus Realty Corp.*, 100 AD2d 924, 925 [1984]). " 'However, [w]here the significant facts [*3]germane to the unconscionability issue are essentially undisputed, the court may determine the issue without a hearing' " (*Simar Holding Corp. v GSC*, 87 AD3d at 690, quoting *Scott v Palermo*, 233 AD2d 869, 870 [1996]). Note the Simar court was reviewing a motion for summary judgment. Here, a motion to dismiss is at issue and all inferences must be drawn in favor of the Plaintiffs as the non-moving party.

35.    Plaintiffs contend the essential facts surrounding the agreement are undisputed and the Court may determine the procedural and substantive unconscionability without a hearing.

36.    Furthermore, NY General Business Law § 349 "declares as unlawful '[d]eceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state,' with no further elaboration of the prohibited conduct" (*Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 NY2d 20, 24 [1995]). "A private action to recover damages under General Business Law § 349 must be predicated on a deceptive act or practice that is consumer oriented" (*Harmon v Major Chrysler Jeep Dodge, Inc.*, 101 AD3d 679, 682 [2012] [internal quotation marks omitted]).

37.    Plaintiffs' action against Coinbase is predicated, in part, on the unlawful, deceptive acts and practices of Coinbase in the conduct of its business, as recited above, in violation of statute.

### VII.    Conclusion

38.    For the foregoing reasons, <u>Defendants' Supplemental Motion to Dismiss and Motion to Compel Arbitration </u>should be denied in full. In the alternative, Plaintiffs request leaves to amend.

Dated: April 10, 2026

*/s/ Mario Tafur*

Mario Tafur (admitted *pro hac vice*)
Bulldog Law, P.C.
500 N. Central Ave. Ste. 610
Glendale, CA 91203
Telephone: (818)  646-8990
mario@thebulldog.law


Philip R. Berwish – Of Counsel
Berwish Law
2 Anderson Lane
Princeton, NJ 08540
Telephone: (800) 547-8717
berwish@gmail.com

*Attorneys for Plaintiffs*
