UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
JOEL HEABEART, et al.,

         Plaintiffs,

    -v-

COINBASE, INC., et al.,

         Defendants.
```

25-cv-9197 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.:

Before the Court are the defendants' motions to dismiss the plaintiffs' securities claims and to compel arbitration of their remaining claims. The Court previously issued a "bottom-line" Order granting both of the defendants' motions. See ECF No. 107. This Opinion explains the reasoning underlying that Order.

I.    Background

Coinbase Global, Inc. is the parent company of the wholly owned subsidiary, Coinbase, Inc. Defendant Brian Armstrong is the CEO of Coinbase, Inc. (The three defendants may be treated for purposes of the instant motions as one and are referred to hereafter as "Coinbase" or simply "defendants."). The plaintiffs are individual Coinbase customers.

As part of the process of signing up with Coinbase, each of the plaintiffs agreed to Coinbase's "User Agreement" which, with their consent, was updated from time to time. The currently operative User Agreement states that "[y]ou and we agree to

1

arbitrate all disputes in binding arbitration."[1] ECF No. 83, Ex. 15, App'x 5 ("Arbitration Agreement"). However, the Arbitration Agreement exempts "[d]isputes about whether you or we have violated state or federal securities laws," which "shall be resolved by a court of competent jurisdiction." Id. ¶ 5.

The Court assumes familiarity with the allegations of the Second Amended Complaint and recounts only those relevant to the instant motions. Coinbase operates one of the largest cryptocurrency exchanges in the United States. SAC ¶ 18. In August 2021, Coinbase listed a digital asset for trading called Wrapped LUNA, or "WLUNA." Id. ¶ 95. When doing so, Coinbase published the following statement on its platform: "Wrapped Luna (WLUNA) is an Ethereum token that's intended to represent Terra (LUNA) on the Ethereum blockchain. Through a WLUNA partner, 1 LUNA can be exchanged for 1 WLUNA, and vice-versa." Id.

Beginning in early May 2022, LUNA's value fell as a result of a collapse in the surrounding blockchain system. SAC ¶¶ 1, 66-70, 73. This crash in the market value of LUNA affected the value of WLUNA. On May 13, 2022, Coinbase announced that it would suspend trading in WLUNA effective May 27, 2022. Id. ¶ 105. The plaintiffs allege that Coinbase characterized this trading suspension as

_____

[1] Except where otherwise indicated, all quotations omit citations, internal quotation marks, footnotes, brackets, ellipses, and other non-substantive alterations in source material.

temporary both in public announcements and in direct text-message responses to customers who inquired about the status of their holdings. Id. ¶¶ 3, 101.

Following the collapse, the plaintiffs allege that Terraform Labs -- the company that created LUNA -- executed a fork of the Terra blockchain and issued a new token, also called LUNA ("New LUNA"), while renaming the original token LUNA Classic ("LUNC"). SAC ¶¶ 99-100. Terraform then "airdropped" (i.e., distributed) New LUNA to holders of LUNC. Id. ¶ 105. The plaintiffs allege that in order to participate in the airdrop, WLUNA holders needed to move their WLUNA off of Coinbase, "unwrap" it, and convert it to LUNC using Terraform's tools -- steps that Coinbase's trading suspension purportedly made effectively impossible for Coinbase customers. Id. ¶¶ 98, 100. Around this time, Terraform also airdropped New LUNA tokens directly to Coinbase, id. ¶ 99, but, plaintiffs allege, Coinbase elected not to distribute these tokens to its WLUNA-holding customers and instead absorbed the airdropped assets, id.

The plaintiffs also allege that certain statements that Coinbase provided to plaintiffs regarding their accounts were materially inaccurate relative to verifiable blockchain data. SAC ¶ 4. One example cited in the Second Amended Complaint is a document for one plaintiff indicating purchases totaling

3

approximately $76 million, purportedly contradicting that plaintiff's transaction history. Id. ¶¶ 4, 109, 152.

Finally, the plaintiffs allege that Coinbase never lifted the trading suspension of WLUNA. SAC ¶ 105.

The plaintiffs are eleven individual retail investors who purchased and held WLUNA on the Coinbase platform prior to the May 27, 2022 trading suspension. Each plaintiff alleges substantial financial losses resulting from Coinbase's suspension of WLUNA trading, its failure to facilitate participation in the New LUNA airdrop, and its post-suspension conduct.

The plaintiffs initiated this action in the Northern District of California, alleging that, among other things, the defendants had committed securities fraud and breached their contract with the plaintiffs.[2] The defendants moved to transfer venue to the Southern District of New York on the basis that the operative User Agreement contained a forum selection clause providing that this District would have exclusive jurisdiction over the dispute outlined in the plaintiffs' amended Complaint. The Northern District of California agreed to transfer venue.

Once in the Southern District of New York, the defendants moved to dismiss the plaintiffs' securities counts and to compel arbitration of the remaining counts. The Court received full

_____

[2] The plaintiffs amended their Complaint shortly thereafter. ECF No. 16.

4

briefing and held oral argument on the motions on March 13, 2026. Afterward, it issued an Order explaining that the Complaint "likely fail[ed] to state securities claims that meet the pleading requirements of the [Private Securities Litigation Reform Act] or the statute of limitations," and that the plaintiffs' non-securities counts would "likely be referred to arbitration." ECF No. 93 at 1-2. Nevertheless, the Court permitted the plaintiffs to amend their Complaint once again and noted that, if the plaintiffs chose to do so, the defendants could renew and supplement their motions to dismiss and to compel arbitration. See id.

Thereafter, the plaintiffs filed a Second Amended Complaint, and the parties renewed their briefing on the motions to dismiss the securities claims and to arbitrate the non-securities claims. The plaintiffs' Second Amended Complaint included, inter alia, additional exhibits that they had not attached to their initial Complaint. One of those exhibits, a report drafted by Extra von NotHaus ("Exhibit A"), became the subject of an additional motion to strike by the defendants. ECF No. 102. On April 22, 2026, the Court issued its bottom-line ruling granting the defendants' motions to dismiss the securities claims and to refer all the other claims to arbitration.

## II.  Discussion

Stripped to its core, the lengthy Second Amended Complaint bases its various causes of action on the claims that (1)

defendants misled investors by claiming that WLUNA represented LUNA when WLUNA had no direct connection to LUNA, (2) defendants misled investors by implying that the WLUNA suspension would be temporary, and (3) defendants provided plaintiffs with inaccurate account statements. Based on these claims, the plaintiffs allege that the defendants violated federal securities law and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and that defendants breached their contract with plaintiffs and the covenant of good faith and fair dealing implied thereto. Further, the plaintiffs allege that defendant Coinbase, Inc. wrongfully interfered with the plaintiffs' ownership rights and was unjustly enriched at their expense.

In response, the defendants argue that the non-securities claims must be referred to arbitration and that the securities claims must be dismissed as untimely and for a host of other reasons.

A. The plaintiffs' non-securities claims must be arbitrated.

The Federal Arbitration Act ("FAA") provides that an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has emphasized that the FAA creates a strong federal policy in favor of arbitration. See, e.g., Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 25 (1991). In turn, a motion to compel

arbitration raises two issues: (1) whether the parties have entered into a valid agreement to arbitrate, and (2) whether the dispute at issue comes within the scope of the arbitration agreement. See Meyer v. Uber Techs., Inc., 868 F.3d 66, 73-74 (2d Cir. 2017). Any ambiguities relating to the scope of the arbitration clause must be resolved in favor of arbitration. See Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ., 489 U.S. 468, 475-76 (1989).

The Arbitration Agreement here is clear. It states that "[y]ou and we agree to arbitrate all disputes in binding arbitration." ECF No. 83, Ex. 15, App'x 5. It further provides that "'[d]isputes' are defined as any dispute, claim, or disagreement arising out of relating in any way to our relationship with you, the Services, the Coinbase Site, any Communications you receive, any products or services sold or distributed through the Coinbase Site, or the User Agreement. The term 'Disputes' is intended to be interpreted broadly." Id. The Arbitration Agreement exempts only "[d]isputes about whether you or we have violated state or federal securities laws," which "shall be resolved by a court of competent jurisdiction." Id. ¶ 5.

No party disputes that, based on the plain language of this arbitration agreement, any plaintiff here who lawfully agreed to the operative User Agreement would need to submit to arbitration any claim against any and all of the defendants here, other than

claims alleging violations of state or federal securities law. Each of the plaintiffs did, in fact, agree to the operative User Agreement. Nevertheless, the Court, in granting plaintiffs leave to submit a Second Amended Complaint, allowed them to include, if they could, factual allegations indicating that, as suggested at oral argument, the agreement was unconscionable and therefore unenforceable. However, plaintiffs, rather than alleging concrete facts demonstrating how the agreement was unconscionable, offer in their Second Amended Complaint simply a few conclusory sentences declaring that the agreement is one of "adhesion and should not be enforced as . . . against public policy." SAC ¶ 25. Such conclusory assertions, wholly untethered from any supporting factual allegations, do not state a claim for non-enforcement of the User Agreement as unconscionable. Indeed, elsewhere in their Second Amended Complaint, plaintiffs appear to recognize as much, for they allege that the very same User Agreement is "valid [and] enforceable." Id. ¶ 129; see also Pearl v. Coinbase Glob., Inc., 2023 WL 1769190, at *7 (N.D. Cal. Feb. 3, 2023) (upholding an earlier version of the User Agreement as valid and enforceable); Aggarwal v. Coinbase, Inc., 685 F. Supp. 3d 867, 881 (N.D. Cal. 2023) (same).

Based on the foregoing, the Court concluded in its Order on April 22, 2026, that all of plaintiffs' non-securities claims (including the RICO claim and the claims of interference with

8

ownership rights, unjust enrichment, breach of contract, and the breach of the covenant of good faith and fair dealing), must be referred to arbitration. See ECF No. 107.

    B. <u>The plaintiffs' securities claims must be dismissed as untimely.</u>

The plaintiffs bring two counts of securities fraud. Specifically, Count One alleges that Coinbase, Inc. violated Section 10(b) of the Securities Exchange Act ("Exchange Act"), in three ways: by falsely representing that WLUNA was pegged to LUNA when it was not (the "peg" claim), by falsely characterizing the WLUNA trading suspension as temporary while knowing or recklessly disregarding the truth that Coinbase would not reinstate trading, and by providing materially inaccurate account statements and tax documentation to the plaintiffs. Count Two alleges that defendants Coinbase Global, Inc. and Brian Armstrong are liable for the misconduct alleged in Count One as controlling persons under Section 20(a) of the Exchange Act. Since the Section 20(a) claims are premised on the Section 10(b) claims, dismissal of the Section 10(b) claims requires dismissal of the Section 20(a) claims.

A Section 10(b) claim must be brought "not later than . . . 2 years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b); see Merck & Co. v. Reynolds, 559 U.S. 633, 638 (2010). Discovery refers to a plaintiff's actual discovery of relevant facts, or of facts that a "reasonably diligent plaintiff would have discovered." Merck, 559 U.S. at 644.

9

The defendants argue that the plaintiffs discovered the facts giving rise to their claims around May 2022, when Coinbase suspended WLUNA trading, but only asserted their claims three years later in May 2025, a year after the statute of limitations expired. The defendants note that the plaintiffs point to no additional facts in their Second Amended Complaint suggesting that any violation occurred after May 2022, and that every allegation relates to facts discoverable by May 2022. In response, the plaintiffs offer different arguments as to each of the three alleged violations of Section 10(b), which the Court rejects for the following reasons:

As to the "peg" claim, plaintiffs allege that although the fact that WLUNA was not actually pegged 1:1 to LUNA was at all times "publicly verifiable," SAC ¶ 106, they could not have brought the peg claim until they received "expert confirmation" of what they could have discovered earlier, id. But the desire for such "expert confirmation" (whatever that means) is no excuse for evading the statute of limitations. Accordingly, the peg claim is untimely.

As to the temporary suspension claim, when Coinbase suspended trading of WLUNA in May 2022, it did not expressly state that the suspension was "temporary."[3] But even if this had been arguably

---

[3] At the prior motion to dismiss argument, the Court considered whether to sanction plaintiffs' counsel for alleging that Coinbase

10

suggested at the time, after the suspension had continued for nearly a year (that is, to the point where plaintiffs could have timely brought a Section 10(b) claim on this theory), no reasonable person could have supposed that the suspension was not likely to last indefinitely.[4] Accordingly, the "temporary suspension" claim is untimely.

As to the account statements claim, while the plaintiffs now allege that the statements' inaccuracies were only discovered in 2024, SAC ¶ 106, they earlier indicated that at least some of the plaintiffs learned of the inaccuracies earlier. See ECF No. 16 ¶ 39; ECF No. 89 at 11. Moreover, this allegation in no material way indicates why these gross inaccuracies in a customer's account statement (whose inaccuracy would have been obvious to any customer) could not have been discovered prior to May 2022. Accordingly, the claim based on inaccurate account and tax statements is untimely.

---

had itself used the word "temporary" by using quotation marks around the word in their Amended Complaint when, in fact, Coinbase had never used the word temporary in their official announcements. Upon further reflection, while the Court remains critical of this mistake, it elects not to impose sanctions.

[4] Plaintiffs' allegations that at some undated time some unspecified "Coinbase representatives . . . repeatedly assured them that the suspension was temporary," SAC ¶ 3, does not remotely meet the particularized pleading requirements of either Rule 9(b) of the Federal Rules of Civil Procedure or those of the PSLRA, and hence is not entitled to any consideration, especially in view of this being a Second Amended Complaint.

The Court has considered plaintiffs' other excuses for not bringing this Section 10(b) claim in a timely fashion and finds them without merit.[5]

For the foregoing reasons, plaintiffs' securities claims were dismissed as untimely.

C. The plaintiffs' securities claims must also be dismissed for failure to meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA").

Section 10(b) claims that are governed, as here, by the PSLRA must plead "(1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation." Ark. Pub. Emp. Ret. Sys. v. Bristol-Myers Squibb Co., 28 F.4th 343, 351-52 (2d Cir. 2022). Plaintiffs must not only plead such claims with particularity under Federal Rule of Civil Procedure 9(b), but also satisfy the PSLRA's heightened pleading standards, 15 U.S.C. § 78u-4(b)(1). As such, the plaintiffs must "stat[e] with particularity the circumstances constituting fraud," including by

---

[5] For example, plaintiffs suggest they could not have brought a securities fraud claim until this Court's 2023 ruling in another case that held that WLUNA was a security. SAC ¶ 106 (discussing SEC v. Terraform Labs Pte. Ltd., 708 F. Supp. 3d 450 (S.D.N.Y. 2023)). But quite aside from the fact that the debate over when and under what circumstances a cryptocurrency token qualifies as a security had been raging for years prior to the Terraform decision, the rule extending the statute of limitations applies only to the discovery of relevant facts, not the law. See In re Bibox Group Holdings Ltd. Securities Litigation, 534 F. Supp. 3d 326, 339-40 (S.D.N.Y. 2021)

"specify[ing] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading" and plead particularized facts raising a strong inference of scienter. ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase, Co., 553 F.3d 187, 196 (2d Cir. 2009). The heightened pleading standard means that a complaint "cannot survive a motion to dismiss where the complaint fails to explain why [the alleged] statements and omissions were fraudulent." Wilbush v. Ambac Fin. Grp., 271 F. Supp. 3d 473, 484 (S.D.N.Y. 2017).

Quite aside from their untimeliness, none of plaintiffs' three claims of fraudulent misstatements meet these heightened requirements. To begin with, to plead falsity, a plaintiff "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Comms., Inc. v. Shar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). None of plaintiffs' allegations of falsity meet these requirements:

As to the peg claim, the plaintiffs claim that the defendants "falsely represented WLUNA's 1:1 peg to Terra's native LUNA token." SAC ¶ 108. But the only relevant statement that plaintiffs point to from Coinbase's website in support of this allegation states only that "[WLUNA] is an Ethereum token that's intended to represent [LUNA] on the Ethereum blockchain." Id. ¶ 95 (emphasis

13

added). Nowhere in this statement do the defendants guarantee that WLUNA will always track LUNA's price.

The plaintiffs alternatively argue that it is the term "wrapped" as used in "Wrapped LUNA" that establishes the allegedly false representation on the part of Coinbase. Specifically, they contend that, in the cryptocurrency industry, the term "wrapped" is a "standard shorthand for a token that is designed to track the value of a native asset on a 1:1 basis through smart-contract logic." ECF No. 104 at 3. This argument fails for at least two reasons. First, this argument relies almost entirely on Exhibit A attached to the Second Amended Complaint, an expert report filed by Extra von NotHaus. But Exhibit A must be stricken under Federal Rule of Civil Procedure 12(f) because it is not incorporated into the Second Amended Complaint by reference, nor is it a written instrument that the Court can consider at this stage in the proceedings. See Ong v. Chipotle Mexican Grill, Inc., 294 F. Supp. 3d 199, 222, 224 (S.D.N.Y. 2018). Moreover, the Second Amended Complaint itself pleads no particularized facts about what Coinbase specifically understood "wrapped" to mean. It states in a conclusory fashion that Coinbase "knew or should have known . . . that the asset was not wrapped," SAC ¶ 25, but provides no support for this allegation. Without specific allegations that the defendants knew that the word "wrapped" carried a particular meaning, and that the defendants intentionally used that word

14

despite knowing WLUNA did not fall within that definition, there is no actionable misstatement.

As to the temporary suspension claim, the plaintiffs argue that Coinbase's use of the word "suspension" implied that the stoppage was temporary. SAC ¶ 104. The plaintiffs further allege that Coinbase representatives assured customers that the suspension would be temporary. Id. Neither theory survives scrutiny.

The first theory fails because the plaintiffs' interpretation of the word "suspension" is implausible in context. The test for whether a statement is materially misleading is whether defendants' representations, "taken together and in context, would have misled a reasonable investor." Rombach v. Chang, 355 F.3d 164, 172 n.7 (2d Cir. 2004). Here, the broader context of Coinbase's contemporaneous statements forecloses any reasonable inference that "suspension" signaled a temporary pause. As the Second Amended Complaint itself acknowledges, Coinbase Cloud announced on May 20, 2022 that it would "no longer support the Terra Ecosystem" and "would not be participating in any future token offerings" by Terraform. SAC ¶ 98. A reasonable investor confronted with Coinbase's disavowal of the entire Terra ecosystem could not plausibly have interpreted a separate announcement -- issued one week earlier -- as promising a resumption of WLUNA trading.

The second theory -- that unnamed Coinbase representatives made assurances of a temporary suspension -- fares no better, because it is entirely devoid of the particularity that the PSLRA demands. The Second Amended Complaint fails to identify which representatives made these assurances, to which plaintiffs, when, or through what medium. The exhibits appended to the Second Amended Complaint, which purport to show customer communications using the word "temporary," are equally deficient: they bear no indication of having originated from Coinbase, and at least one is dated July 29, 2024, more than two years after the trading suspension and the Terra ecosystem's collapse. SAC, Ex. G at 82-83. A statement made in 2024 cannot plausibly be said to have contextualized a 2022 trading announcement in a way that misled investors at the time. And even accepting, arguendo, that representatives did use the word "temporary" in 2022, the plaintiffs plead no facts showing that this characterization was false when made -- that is, that Coinbase had already decided at the time of announcement that it would never reinstate trading. The plaintiffs' conclusory assertion that Coinbase had "internal knowledge that it would not restore trading," SAC ¶ 109, is the type of unadorned allegation that the PSLRA's particularity requirement prohibits.

As to the account statements claim, the plaintiffs allege that Coinbase's records reflected inaccurate transaction values for their WLUNA holdings, thereby misleading them about the value

16

of their positions. SAC ¶¶ 101, 103. This theory is self-defeating. The plaintiffs affirmatively allege that the account statements displayed "impossibly large 2021 transaction values that contradicted blockchain records" -- values the SAC elsewhere characterizes as "wildly inconsistent with on-chain reality." SAC ¶¶ 4, 101, 103. Where, as here, an alleged inaccuracy is so patent on the face of the statement that any reasonable investor would immediately recognize it as an error, the statement cannot have misled anyone. A plaintiff cannot, in the same breath, describe an inaccuracy as "impossible" and contrary to "publicly" verifiable blockchain records, and then claim that investors reasonably relied on those figures as accurate representations of their holdings.

In short, quite aside from the untimeliness, plaintiffs' claims fail to adequately plead falsity to the degree required by the PSLRA. But there are still other deficiencies, and the Court turns next to scienter. Under the PSLRA, to survive dismissal, plaintiffs must plead particularized facts giving rise to a "strong inference" that the defendants acted with fraudulent intent or conscious recklessness -- an inference that must be "more than merely plausible or reasonable" and must "be cogent and at least as compelling as any opposing inference of nonfraudulent intent or mistake." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007). In this Circuit, that standard may be satisfied

17

by alleging facts to show either motive and opportunity to defraud, or strong circumstantial evidence of conscious misbehavior or recklessness. See, e.g., Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000). The plaintiffs have done neither.

As to motive, the plaintiffs point primarily to Coinbase Ventures' $25 million investment in Terraform Labs in January 2021 and Armstrong's alleged "indirect equity exposure" to that investment. SAC ¶ 104. The theory, as best the Court can discern it, is that Coinbase had a financial stake in bolstering LUNA's price and therefore a motive to misrepresent WLUNA's characteristics. But the Second Circuit has long held that generalized allegations of a desire to profit -- shared by virtually every corporate actor -- do not establish motive under the PSLRA. See Novak, 216 F.3d at 307-08. What is required is a concrete and personal benefit flowing to the defendants from the specific fraud alleged. Id.; see S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 108 (2d Cir. 2009). The plaintiffs have not identified such a benefit with particularity. They allege that Coinbase "may in fact have received LUNA 2.0" from the airdrop on its native LUNA holdings, ECF No. 104 at 15, and that limiting the pool of airdrop participants would have increased the value of Coinbase's own holdings -- but the Second Amended Complaint itself concedes this is speculative, offering nothing more than the possibility that Coinbase received New LUNA and that this may have

18

inured to Coinbase's benefit, see SAC ¶ 99. Possible self-dealing built on stacked inferences does not satisfy the PSLRA's demanding particularity requirements. See Elliott Assocs., L.P. v. Hayes, 141 F. Supp. 2d 344, 359 (S.D.N.Y. 2000).

As to conscious recklessness, the inquiry is whether the defendants "knew facts or had access to information suggesting that their public statements were not accurate." Novak, 216 F.3d at 308. Where, as here, the motive allegations are thin, "the strength of the circumstantial allegations must be correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001). Each of the plaintiffs' three theories falls short.

For the peg claim, the plaintiffs argue that Coinbase, given its investment in Terraform and its technical due diligence in listing WLUNA, must have known that the WLUNA smart contract contained no on-chain peg enforcement logic. SAC ¶ 104. The Court has some sympathy for the intuition underlying this argument: it is not implausible, as a general matter, that a sophisticated exchange conducting due diligence might have reviewed WLUNA's smart contract and discovered its architecture. But intuition is not pleading. The PSLRA requires plaintiffs to "specifically identify the reports or statements" that apprised defendants of information contradicting their public representations. Maloney v. Ollie's Bargain Outlet Holdings, Inc., 518 F. Supp. 3d 772, 780 (S.D.N.Y. 2021). The Second Amended Complaint does not allege which

19

personnel reviewed the WLUNA contract, what they found, when, or whether that information was communicated to anyone responsible for the public-facing statements at issue. The plaintiffs assert that "it is highly unlikely" that Coinbase's engineers would have overlooked the absence of wrapping logic, ECF No. 104 at 5, but the PSLRA forecloses this kind of inferential pleading. The plaintiffs also note that WLUNA's smart contract was "publicly verifiable," SAC ¶ 104, but the fact that anyone *could* have reviewed the contract does not establish that Coinbase *did* review it and acted with knowledge of what it found. See In re GeoPharma, Inc. Sec. Litig., 399 F. Supp. 2d 432, 452 (S.D.N.Y. 2005).

For the temporary suspension claim, the plaintiffs' most specific scienter allegation concerns the May 12, 2022 Terraform "war-room" chat in which a "Coinbase Cloud representative" named "Rohit" allegedly participated, and through which Coinbase purportedly learned of Do Kwon's plans for the New LUNA fork, the airdrop, and the snapshot dates.[6] SAC ¶¶ 97, 104. The problem with this allegation is that the Second Amended Complaint fails to plead the most basic details about this communication. It does not identify "Rohit's" role or seniority within Coinbase, what specific information was disclosed in the chat, or whether -- and

---

[6] The "snapshot dates" here refer to the dates -- May 7 and May 27 -- on which Terraform measured the type and quantity of New LUNA tokens that users would receive based on their holdings.

20

through what channel -- any such information reached the Coinbase personnel responsible for public statements about the trading suspension. A single unidentified employee's presence in a third-party chat does not establish that Coinbase senior management possessed contradictory information at the time the allegedly misleading statements were made. See Bd. of Trs. of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO, 811 F. Supp. 2d 853, 870-71 (S.D.N.Y. 2011).

For the account statements claim, the plaintiffs offer no particularized allegations that any Coinbase employee knew the account statements were inaccurate when they were generated, let alone that the inaccuracies were deliberately introduced or consciously maintained. The SAC's assertion that "internal Coinbase records (to be produced in discovery) show Defendants continued to facilitate WLUNA trades internally while publicly suspending retail access," SAC ¶ 104, fails because the PSLRA requires plaintiffs to plead particularized facts of a party's scienter before discovery, not to flag documents they hope will materialize once discovery opens. See In re Bisys Sec. Litig., 496 F. Supp. 2d 384, 387 (S.D.N.Y. 2007). And the Court has already concluded that the account statements could not have misled any reasonable investor. The inference that Coinbase acted with fraudulent intent in generating records that plaintiffs themselves

describe as obviously aberrant -- displaying values in the hundreds of millions, SAC ¶ 103 -- is not a cogent one.

And there is more. Even if the plaintiffs had timely and adequately pled actionable misstatements and scienter -- and they have not -- their claims would independently fail for inadequate pleading of reliance and loss causation. A plaintiff bringing a securities fraud claim must plead, among other things, both (1) that it relied upon defendant's allegedly fraudulent conduct in purchasing or selling securities, and (ii) that the defendant's conduct caused, at least in part, plaintiff's loss. See In re Initial Public Offering Sec. Litig., 383 F. Supp. 2d 566, 576 (S.D.N.Y. 2005). These two elements are known, respectively, as "transaction causation," i.e, reliance, and "loss causation." Id. The plaintiffs' claims fail on both accounts.

Begin with reliance. As to the peg claim, the plaintiffs assert that they purchased and held WLUNA in reliance on Coinbase's representation that the token maintained a 1:1 exchange mechanism with LUNA. But the allegedly misleading peg statement appeared on Coinbase's website in August 2021. SAC ¶ 95. The Second Amended Complaint fails to allege, with any specificity, that any individual plaintiff actually saw that statement before purchasing WLUNA, or that the statement was a but-for cause of any particular purchase decision. See In re Lehman Bros. Secs. & ERISA Litig., 2013 WL 5730020, at *4 (S.D.N.Y. Oct. 22, 2013) (holding that

22

plaintiffs did not establish reliance where they did "not allege that they read the SEC Filings" purported to contain mischaracterizations). Broad assertions that plaintiffs "reasonably relied" on Coinbase's characterization of WLUNA as a wrapped token, SAC ¶ 25, are conclusory. The Second Amended Complaint does not allege when each plaintiff purchased WLUNA, whether the peg statement was visible to them at the time of purchase, or how it factored into their individual investment decisions.

As to the temporary suspension claim, the plaintiffs argue that they continued to hold WLUNA -- rather than taking steps to unwrap or transfer their tokens in anticipation of the New LUNA airdrop -- in reliance on Coinbase's representations that the trading suspension was temporary. SAC ¶¶ 3, 104. But in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975), the Supreme Court stated that a private right of action under Rule 10b-5 is confined to "actual purchasers and sellers of securities"; the mere act of holding a security does not necessarily give rise to a cognizable Section 10(b) claim. See First Equity Corp. of Fla. v. Standard & Poor's Corp., 869 F.2d 175, 180 n.2 (2d Cir. 1989); In re WorldCom, Inc. Sec. Litig., 382 F. Supp. 2d 549, 559 (S.D.N.Y. 2005) ("It has long been established that holders of securities cannot bring federal securities law claims."). And the Second Amended Complaint does not allege that any plaintiff purchased or sold WLUNA after

23

the May 27, 2022 suspension announcement, indicating they have no cause of action as to the suspension claim. The plaintiffs attempt to resist this conclusion by arguing that Coinbase's conduct intentionally curtailed their ability to transfer their assets. ECF No. 104 at 17. But the causal agent in the plaintiffs' own telling is not the misstatement -- the alleged representation that the suspension was "temporary" -- but rather Coinbase's independent operational decision to shut down its Terra infrastructure. Accordingly, the plaintiffs were not harmed by the alleged misrepresentation; if they were harmed at all, it was by the shutdown itself.

As to the account statements claim, the reliance theory is self-defeating for the reasons the Court has already discussed. The plaintiffs concede that the account statements displayed values that were "impossibly large" and "wildly inconsistent with on-chain reality." SAC ¶¶ 4, 101. Any reliance on figures the plaintiffs simultaneously characterize as obviously erroneous is unreasonable as a matter of law.

The plaintiffs' loss causation theory fares no better. To plead loss causation, a plaintiff must allege that the defendant's misrepresentations caused the economic harm suffered -- that is, that the loss flowed from the materialization of the risk the misrepresentations concealed, rather than from independent market forces or the actions of third parties. See Lentell v. Merrill

24

Lynch & Co., 396 F.3d 161, 174 (2d Cir. 2005). The crux of the plaintiffs' claimed injury is that they are entitled to the peak value of the New LUNA tokens that Terraform airdropped following the Terra ecosystem's collapse. SAC ¶¶ 7-17. That theory depends on a chain of inferences so "speculative and distended," Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd., 663 F. Supp. 3d 334, 368 (S.D.N.Y. 2023), as to be legally insufficient.

Consider what the plaintiffs' loss causation theory actually requires: that but for Coinbase's alleged misrepresentations, each plaintiff would have (1) unwrapped their WLUNA through a third-party partner, converting it to native LUNA; (2) held that native LUNA at the right moment to qualify for Terraform's airdrop snapshots; and (3) received New LUNA tokens from Terraform in an amount sufficient to cover the losses they suffered. Each of these steps is contingent on the independent actions of third parties -- principally Terraform, which designed and administered the airdrop according to its own criteria and timeline. The plaintiffs do not, and cannot, allege that Coinbase had any control over Terraform's airdrop eligibility rules, snapshot dates, or allocation methodology. Where a plaintiff's theory of loss causation "relies on a chain of inferences far too speculative and distended" to connect the defendant's conduct to the ultimate harm, dismissal is required. Altimeo Asset Mgmt., 663 F. Supp. 3d at 368.

The account statement theory of loss causation fails for a distinct but equally fundamental reason. The plaintiffs would have suffered precisely the same economic loss on their WLUNA holdings regardless of whether Coinbase's account statements accurately reflected their transaction history. See Puchtler v. Barclays PLC, 2025 WL 887502, at *20 (S.D.N.Y. Mar. 21, 2025) (finding that a plaintiff who "would have suffered the same loss" regardless of defendants' acts or statements suffered no loss causation). The account statement inaccuracies, whatever their source, had no bearing on the value of the plaintiffs' WLUNA, their ability to participate in the airdrop, or the Terra ecosystem's collapse.

III. Conclusion

For the foregoing reasons, the Court hereby re-confirms its earlier "bottom-line" Order granting the defendants' motions to dismiss the plaintiffs' securities claims and to arbitrate the plaintiffs' non-securities claims in their entirety. The Clerk's Office is respectfully directed to enter judgment in defendants' favor dismissing Counts One and Two and to otherwise stay the case pending the results of arbitration.

SO ORDERED.

New York, NY
May 7, 2026

_____
JED S. RAKOFF, U.S.D.J.

26